GEORGE BROWN V. THE STATE.

No. 2014.   Decided May 28, 1913.

Rehearing denied June 3, 1914.

**1.—Murder—Continuance.**

Where, upon trial of murder, the application for continuance showed a want of diligence and that some of the testimony was hearsay, there was no error in overruling same.

**2.—Same—Evidence—Experiment.**

Upon trial of murder, there was no error in permitting witnesses to testify about making a test with the iron rod alleged to have been used in the homicide to see if one could strike the wall with it and make the indentation in the wall, striking where the defendant said the man stood whom he claimed struck the blows on deceased's head.

**3.—Same—Rule Stated.**

If experiments, as to any disputed facts testified to at the trial appear to have been made, under conditions similar or approximately similar to those which surround the original transaction, and such experiments would serve to shed any light upon that transaction, proof of the result of same is admissible. Following Speers v. State, 55 Texas Crim. Rep., 368, and other cases.

**4.—Same—Evidence—Declarations of Deceased.**

Upon trial of murder, there was no error in sustaining an objection to the question whether the witness had not heard her mother (the deceased) say long before the homicide that if it were not for the children she and her husband would get along all right, as this was hearsay; defendant denying being a responsible agent for her death. Following Johnson v. State, 66 Texas Crim. Rep., 586, and other cases.

**5.—Same—Evidence—Imputing Crime to Another.**

Upon trial of murder, where defendant was charged with the killing of his wife who had been divorced from her former husband several years before the homicide, and it was not shown that the said first husband either had the motive or opportunity or was placed in such proximity to the homicide as to show he may have been guilty thereof, there was no error in excluding remote acts and threats by certain parties who were in no way identified. Following Kunde v. State, 22 Texas Crim. App., 65, and other cases.

**6.—Same—Evidence—Declarations of Deceased.**

Upon trial of murder, there was no error in excluding testimony as to statements alleged to have been made by deceased to others some eight or ten days before the homicide that she loved her husband, the defendant, and that the children were the cause of the trouble; that defendant had rescued her when she was about to drown while bathing, etc., the defendant having been permitted to testify to all these things.

**7.—Same—Evidence—Declarations of Defendant.**

Upon trial of murder, there was no error in not admitting testimony as to a statement by the defendant made some time prior to the homicide that he would not let his wife, the deceased, drive a certain horse because it would kill her; besides, the defendant himself testified to this fact.

**8.—Same—Rule Stated—Declarations of Deceased—Hearsay.**

Where, upon trial of murder, the defendant was permitted to show the relations between deceased and himself before the homicide by persons who testified to same by their own knowledge thereto, there was no error in excluding testimony as to what they were told by the parties.

**9.—Same—Evidence—Charge of Court—Invited Error.**

Where the son of the deceased testified that he was asleep when his mother was struck the fatal blows, but was awakened by the defendant, when he heard his mother speak, and the State was permitted to show that he told other witnesses that his mother did not speak, and defendant was then permitted to show that said witness about half an hour after the injury had been inflicted stated that he heard his mother speak, there was no error in the court limiting such testimony to the credibility of the witness; besides, if error, the same was invited by the defendant and was favorable to him. Davidson, Judge, dissenting.

**10.—Same—Rule Stated.**

It is the general rule of law that when counsel has requested the court to charge a given proposition of law and it is given, such error can not be taken advantage of by the party whose counsel made the request. Following Cornwell v. State, 61 Texas Crim. Rep., 122.

**11.—Same—Harmless Error—Evidence—Declarations by Deceased.**

Where defendant contended that the deceased, after having received the fatal blow, raised up in bed and spoke, and there was nothing in what it was claimed she said that would even tend to show whether defendant was the person who inflicted the injury or would throw any light on the question as to who struck the blow, the court's charge with reference to limiting the testimony to the credibility of defendant's witness, if error, was harmless. Davidson, Judge, dissenting.

**12.—Same—Charge of Court—Murder in the First Degree.**

Where the reading of the court's charge on murder in the first degree showed that the defendant's complaint thereto was without foundation, when considering the charge of the court as a whole, there was no reversible error.

**13.—Same—Circumstantial Evidence—Charge of Court.**

Where, upon trial of murder, the court's charge on circumstantial evidence was according to approved precedent, there was no reversible error. Following Ramirez v. State, 43 Texas Crim. Rep., 455, and other cases.

**14.—Same—Exculpatory Statements—Charge of Court.**

Where the State introduced the statement of the defendant to the effect that he had just returned to his bed and was dozing when someone struck the deceased, his wife, etc., and the court properly instructed the jury that the State was bound thereby, unless the falsity of same was proven, etc., and that this could be done by circumstantial evidence, there was no error; besides, the objections to the charge was too general. Following Quintana v. State, 29 Texas Crim. App., 401, and other cases. Davidson, Judge, dissenting.

**15.—Same—Charge of Court—Exculpatory Statements.**

Where the court's charge on exculpatory statements was sufficient, and besides, defendant's special requested charge thereon was also submitted, there was no reversible error.

**16.—Same—Imputing Crime to Another—Charge of Court—Article 743.**

Where, upon trial of murder, there was no testimony which raised the issue that the crime was committed by any other than the defendant and the court submitted a sufficient charge on circumstantial evidence, the reasonable doubt and that the statements of the defendant denying the homicide must be shown to have been false, there was no reversible error, especially under article 743, Code Criminal Procedure, in the absence of other requested charges. Following Crutchfield v. State, 7 Texas Crim. App., 65, and other cases. Davidson, Judge, dissenting.

**17.—Same—Charge of Court—Husband and Wife.**

Where the defendant was charged with the murder of his wife, there was no error in refusing a requested charge that the law indulged an additional presumption of innocence because of the relationship of husband and wife.

**18.—Same—Charge of Court—Requested Charges.**

Where the requested charges were fully covered by the court's main charge, and the one relating to the remarks of the district attorney was not based upon a bill of exceptions, there was no error.

**19.—Same—Verdict—Extension of Term of Court.**

Upon trial of murder, there was no error in receiving the verdict and entering judgment after the regular term of court had expired, but was extended under article 1726, Revised Statutes.

**20.—Same—Decisions of Other States.**

See opinion for discussion of decisions of other States as to declarations of deceased.

**21.—Same—Imputing Crime to Another—Evidence—Rule Stated.**

A person charged with homicide may show as a defense that another did the killing, but before such proof is admissible, it must first be shown that such person is in such proximity to the person slain that he could have committed the offense. Following Dubose v. State, 10 Texas Crim. App., 230, and other cases.

**22.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence, although circumstantial, sustained the conviction, there was no reversible error.

**23.—Same—Evidence—Declarations of Deceased.**

Where, upon trial of murder, defendant was permitted to testify to the fact that he and deceased had gone in bathing and after he had gone out of the water and was putting on his clothing, his wife, the deceased, got into deep water and was about to drown when he rushed into the water and saved her, and the State offered no proof to contradict this testimony, and all persons who knew anything about the fact were permitted to so testify, there was no error in excluding testimony as to statements either made by him or the deceased to others. Davidson, Judge, dissenting.

**24.—Same—Rule Stated—Narrative Statements.**

The rule does not permit the introduction of a narrative of past events made after the events are closed by either the party injured or by the defendant. Davidson, Judge, dissenting.

**25.—Same—Evidence—Declarations of Deceased.**

Upon trial of murder, where the State had been permitted to show a separation between the defendant and the deceased, the relationship existing between the defendant and the deceased, his wife, as bearing on the question as to whether he desired her death, could not be proved by statements of the deceased made to others some time before the homicide to the effect that she loved her husband, etc.; no permanent separation having been shown, and if any difference had existed between the parties, a condonation had taken place prior to that time. Davidson, Judge, dissenting.

Appeal from the District Court of Runnels.  Tried below before the Hon. J. W. Goodwin.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life.

The opinion states the case.

*W. F. Ramsey* and *C. L. Black* and *T. C. Wilkinson* and *Scott & Foster* and *P. M. Faver* and *Snodgrass & Dibrell* and *Jno. I. Guion*, for appellant.—Cited cases in dissenting opinion.

*C. E. Lane*, Assistant Attorney General, *R. L. McGaugh, H. F. David, W. U. Early*, and *Stone & Wade*, for the State.—Cases cited in majority opinion.

HARPER, JUDGE.—Appellant was prosecuted, charged with the murder of his wife, convicted of murder in the first degree, and his punishment assessed at imprisonment for life.

The offense was alleged to have been committed in Brown County, but was tried in Runnels County on a change of venue.

Appellant had been married prior to his marriage to Mrs. Sallie Brown, the woman whom he is alleged to have killed, and had a number of children by his first wife. Mrs. Sallie Brown had also been married prior to her marriage to appellant, and also had children by her former husband. Appellant and his wife were married January 4, 1910. Appellant and his wife were living on a farm about six and a half miles from Brownwood, when in November, 1910, she left the farm and moved to Brownwood, remaining there until March, 1911, when she returned to the farm, the homicide occurring at the farm on September 9, 1911. All the children had gone to town to a show except the three little ones, who will hereafter be referred to. About ten o'clock that night Mr. Ivy Beeman says appellant called him over the telephone, and said, "Mr. Beeman, I wish you would come down here quick, a burglar has knocked me and my wife in the head and tried to kill us both." The witness says he replied all right, and began to dress, but before he got ready to go appellant called him again and said, "I wish you would come quick, my wife is hurt bad and I am afraid she will die before you get here; there is blood all over everything and I wish you would come quick." He then details in what condition he found Mrs. Brown, the defendant's statements at the time, etc., but as we will quote extensively from the statement of Dr. Tottenham, the family physician of Mr. Brown, who states the matter more succinctly, we will not recite Mr. Beeman's testimony. Dr. Tottenham testified he was called that night and went immediately, and then testifies:

"I came in and spoke to Mr. Brown and Mr. Beeman and said, 'Good evening,' or something of that kind, and Mr. Brown made an exclamation, 'My God,' or something of that kind, 'Isn't this awful?' I think I said 'Good evening' to him, and he says, 'My God, isn't this horrible or awful?' or something to that effect, and I says, 'It certainly is, how did it happen?' and he proceeded to tell me then; he told me that he had been taking some medicine and had been up with his bowels once or twice, and wasn't sleeping sound, and that he was lying on the inside of the bed and his wife was on the outside, and he said he wasn't sleeping sound, just kinder dozing, and indicated to me how he was lying on his right side facing his wife, and had his eyes shut, and he said

he heard something tip up on the gallery and 'I thought it was a dog,' and he says, 'Then I heard the lick,' and says, 'I opened my eyes and looked up and I saw a man drawn back,' and he indicated to me then with his arm; he was standing up at that time; he was standing between the bed and the wall near the head of the bed, and said he was lying on his right side facing his wife, and he says, 'I heard some one tip up on the gallery and I thought it was a dog, and then I heard the lick,' and he says, 'I opened my eyes and looked up'; when he was telling me this I was standing at the head of the bed, and he was in this position; he was talking and standing about like you are now, and I was standing at the head of the bed, and he was between the bed and the wall; he said, 'I heard something come up on the porch,' and he was looking this way when he made this statement and says, 'I thought it was a dog'; he was looking towards this southeast step, the same step I entered from; he didn't do anything else with reference to indicating that step except looking that way and facing that way when he was talking; he said he thought it was a dog, and then he heard the lick, and he wasn't sleeping sound, he was dozing, and says, 'I looked up' and he indicated on his arm a distance of about eighteen or twenty inches something that he said the man had raised up; he was still standing near the head of the bed near this window, and he says he looked up and saw him drawing back to hit him, and says, 'I ducked, and as I ducked I felt the wind as it passed my head,' and he turned then and pointed to the wall opposite the bed to the right of me and says, 'See there,' and pointed to the wall right along here; he was standing close to this window, right about here; he turned around and pointed to the wall and says, 'See there where he like to have killed me or tried to kill me, that is where he hit the wall'; I saw the indentation on the wall then, and I still stood at the head of the bed; I says, 'What did you do then, Mr. Brown?' he says, 'I jumped up and ran between the bed and the wall into this room, the north room, to get my gun,' and as he ran, he says, he used an oath and said that he would kill him, or something to that effect, he says, 'You son-of-a-bitch, I will kill you,' and started after his gun; he said as he entered this door he was afraid the man would follow him and he closed this door, and as he looked over his shoulder his pants was on this chair at the foot of the bed with four dollars and something in his pants, and a Woodman receipt and a five-dollar pearl handled pocketknife, and says, 'He grabbed my pants and run,' and says, 'You will find the pants somewhere where he throwed them down, he won't carry them far'; I says, 'What did you do then?' he says, 'I got my gun from the closet as quick as I could and the shells from over the closet and came back out here'; I says, 'Did you see the man?' he says, 'No'; I says, 'Did you run after him?' he says, 'No, I went to my wife'; I says, 'What was your wife doing then?' he says, 'She was sitting on the edge of the bed'; I says, 'Did she holler?' he says, 'No, she said her head hurt her'; I changed my position then to this side of the bed, and he was still standing in his same position over by this window of the middle room, near the edge of the bed; I went around then be-

tween the edge of the bed and the gallery and I noticed that there was water on the floor; I says, 'What caused this water, how is this water here,' and he says, 'She vomited and I washed it up'; he didn't say what she vomited; he says, 'I found the iron that he hit her with,' and he pointed down to the gallery post, right opposite here and just back of the gallery post on the ground, and there was a bar of bridge iron laying there; he says, 'It is a piece of railroad iron, a piece of bridge iron'; I looked down through the vines there and I saw this piece of iron laying in the front yard in front of the gallery; I didn't disturb the body at all, I saw that nothing could be done for her; didn't think she would live more than an hour or two; I told him to start a fire and get some hot water and he went off to start the fire, and he brought me some cold water, and then he went off to start the fire and get some hot water, and in the meantime I believe the officer had come; I made an examination of that iron when he handed it to me; I think I saw that iron after Mr. Daniels came; I didn't bother anything until Mr. Daniels came; when I got there I found the deceased lying on the outer edge of the bed, lying upon a pillow; she was lying on the east side of the bed and her head was lying a little to the outer edge of the pillow and her face turned a little towards the wall, and she was lying on her back; she was dead to all appearances and you couldn't see any respiration at all, you couldn't see her breathing at all; her pulse was scarcely perceptible and you couldn't hardly feel it it was so weak; after the officer came I examined her head, and there was a mass of brain just beat into a jelly protruding over the right eye, just sticking right down here, and I removed that protruding mass of brain and some fragments of skull that was easily gotten to; I didn't go deep into this fracture, this large opening here, and I placed the skin flaps over this opening and put on aseptic dressing, and then examined the other side, and over the left eye; about an inch or an inch and a half from the wound over the right eye was a horizontal fracture an inch or an inch and a quarter long that could be plainly felt and seen through the skull; you could see the fracture plain over the left eye; by fracture I mean that the skull was broken; that fracture over the left eye was about an inch or an inch and a quarter in length; over the right eye I found that there was a fracture about an inch and a half or two inches square, and the process over the right eye was broken in; that was the supraorbital process; that supraorbital process runs backward under the brain and between the eye and the brain and the optic nerve; I suppose that runs back an inch and a half; that supraorbital process is composed of bone, but it is not very thick there; right in front of that supraorbital process is the thick portion of the skull; the nasal bone was broken in but I made no examination further than that; I didn't make any further examination at that time because I didn't think it was necessary, I didn't think anything could be done for her, and I knew that it wasn't necessary at that time; I then cleansed her off as well as I could and put on a clean gown and carried her into this south room and placed her on a bed; I stayed there until about eleven or eleven-thirty on Sun-

day morning; I heard the defendant say something as to the number of licks that party struck his wife; he says, 'I heard the lick,' and he made that statement more than once; I took the iron rod that he showed me and put it into this opening over the left eye; I then said, 'These wounds couldn't have been produced by one lick,' and he said, 'There might have been more than one lick'; I made a comparison or test with that iron; I found a downward glancing stroke on the wall; that wall was made of pine plank painted white, weather boarding; I went around and looked at it and I saw that this instrument had produced that, had hit the wall there; it looked like there had been more than one lick on the wall; I saw that the wall had been indented in one or two places and that there was blood splashes below the indentation, running down that way, south; I know that I found as many as two indentations there; the defendant motioned that the party was standing opposite Mrs. Brown's pillow and about a foot and a half below the pillow when he struck the wall, about a foot or a foot and a half from the head of the bed, towards the foot; that was between the bed and the outer edge of the gallery, and he struck across the bed at him over here; I made a test to see whether that could be done; the bed had not been moved at that time.

"I think I saw the defendant that night stand on this spot and show the officer where this supposed burglar stood; the defendant had not been arrested at that time; the officer said he wanted to get right on the scene there as soon as he could, and the defendant proceeded to show him; at that time I stood at that spot where he indicated to the officer the supposed burglar stood and made the test; I stood at the head of the bed where he stood and tried to reach across the bed to the wall with this bar of iron; I stood just about here and tried to reach across; I stood about a foot or a foot and a half from the head of the bed, north, down the side of the bed, and tried to reach across the bed and strike the wall here; I was standing on the east side of the bed, and I tried to strike where this indentation was on the west side of the porch, and I couldn't reach it, I would fall short; I didn't measure the distance from the indentation on the wall to the place where the defendant said the supposed burglar stood.

"After the defendant told me he came back out on the porch with his gun, he said that he got some water and bathed her face and put a wet cloth over her head, and there was a wet cloth over the wound when I got there; he told me further that the burglar stole his pants and this money and that we would find the pants whichever way the burglar went, that he would throw them down; he told me that he had a five-dollar pearl handled knife in those pants; he told me where he got that knife, but I don't remember now what he told me about that; he said he had some four dollars in silver and a Woodman receipt in his pants; he first said he saw the man steal his pants here and run, and then later he says, 'He run south through the cane patch'; that was in response to the questions of the officer, Hard Daniels; he also told me

that he had telephoned to me, and I asked him if he had called the officers, and he said 'No.'

"When I got there that night, down on the east side of the bed in front of the pillow, towards the foot of the bed, I found fragments of skull and brain tissue and lots of blood, hemorrhage; that blood was on the bedding, and some between the bed railing and the mattress; I picked up all of these fragments of bone and put them on a table—there was a table sitting in here, and I afterwards picked up a number of fragments of skull on the ground in front of the gallery; there was also blood and brain tissue on the ground near the edge of the gallery; I found something like two tablespoonfuls of brain tissue there; I found that bed to be very bloody; the most of that blood was in the center of the bed on the east side; at that point the bed was very bloody, and there was brain tissue brushed against the bed and fragments of skull there; the pillow that she was lying on wasn't very bloody, the most of it was water; there was not a very large quantity of blood and water on the pillow, but most of it looked like water; if I remember right, the outer half of that pillow was covered with that; those pieces of bone that I found on the bed and on the ground were fragments of the frontal bone of the skull; they were fresh bones; they came from the frontal region, which region is over both eyes; this bone that I found was from over the right eye; the main wound was over the right eye; all of the skull was gone in the wound over her right eye for about an inch and a half or two inches square; I made my first examination of that wound by the light of an ordinary kerosene lamp, which made a poor light; I think after I moved her into the room I gave her some hypodermic stimulants for her heart; I didn't make a careful examination of her body, I made a hurried examination of her body because I wanted to get her moved from this bed; I never stripped her and made a close examination of her body after I took her in the room; I stayed with her until about eleven o'clock Sunday, and then I went to Brownwood, and came back about one-thirty or two o'clock. I think she died about eight or nine o'clock Sunday morning, but I wasn't present when she died. I have license to practice medicine, and have been in the practice twelve years; I am a graduate of Tulane University at New Orleans; I have been in the general practice part of the time and in hospitals part of the time; I have enough understanding of the brain and the head and the wounds to give an opinion as to whether or not it would have been possible for that woman to have sat up in the bed and talked after receiving those wounds; in my opinion she could not have spoken. I made an examination of her skull to find out how many distinct wounds I could find on it; I found two large wounds, and I found the skin over this one was cut in a number of places and was ragged, and a horizontal wound over the left eye; her nasal bone was fractured, and you could see from the bulging out here that it was broken."

Dr. McCarver testified he was county physician of Brown County, and after Mrs. Brown's death he testified he made an examination of the body. He says: "I removed the sheet over her head and observed

the large wound over her right eye with my finger. I found that the bone was removed. I found no resistance on the part of the bone from the middle of the nose two inches to the left and a little over two inches above; I found that the bone was removed and on pressure I only felt a soft mass; that large wound was over her right eye; I found that from the center here above the nose two inches to the right in this direction the bone was missing; if I said the left before I meant the right; I found that the bone in this direction a little over two inches had been removed, or at least there was no resistance from the bone there; I found a flap of skin extending from the external angular process some inch and a half, and then a small flap of skin from that; this tag of skin was a perfect flap and that was lying on the mass below, lying on brain clots and so forth; I found a wound about the left eye one-half inch above the eyebrow, one and five-eighths inches long extending at an angle of about fifteen degrees with the body, almost parallel, and then after pulling the skin back, I saw that the periosteum or the thick covering that goes immediately over the bones, was cut at an angle of fifteen degrees, and I noticed a notch in that periosteum; the skin there was rather ragged, and I took my finger and went in here where I found no resistance on my right, and I found that that skull was fractured and depressed over the left eye; that fracture was something over two inches; I know it was fractured as far as I felt back, and I possibly run my finger back two inches or more. This is a human skull; I took this skull with me when I went to hold the autopsy; an autopsy is an examination of the body after death to see the extent of the injury; this is the wound that I spoke about over the left eye; this is the one in the skin; that is a smaller skull than the skull of the deceased; two inches here from the middle like will carry you almost outside of the skull; I bought this for a woman's skull, but it is not so wide as that of the deceased; two inches here from the center of this line will carry you outside of the skull, and it was actually two inches, for I measured it; now this other skull here comes nearer being the size of the skull of the deceased and yet it is not as wide as hers was; I found that the bone was removed inside of this black line here, this bone was all removed, and from there down to here, all that bone was pressed back and had been knocked back into the brain, just perfectly loose; this part of the bone up here is what we know as the frontal bone; the supraorbital plate is here above the eye, a part of the frontal bone; that is above both eyes; I found that the main part of the frontal bone here was not present and had been removed over the right eye, and extending one-third of the way of the left eye; I pulled pieces of the supraorbital plate the length of my finger back in that brain, with my left index finger and my thumb; there being no bone here on the right side, I ran my finger in here to find if this wound over the left eye had fractured the skull; I found a depressed fracture over the left eye, and found that the bone was rough and had been fractured, and the mesial part on towards the center of the brain had been depressed; I found a wound across the nose an inch and a half long, almost in a horizontal direction across the nose;

I also found a cut here immediately over the nose in the skin; this part here that I marked out where the bone was gone, the skin overlapped that and it was ragged, and this skin flap here had the same appearance; I took hold of the sphenoid bone here; this is the nasal bone here, and this of course running back in there to that point is the frontal bone; I found this whole thing pressed back, and that sphenoid bone behind the supraorbital plate of the front of the bone had also been broken off and knocked back; in my examination I found part of the supraorbital plate and pulled it out; I also found a cut across the nose an inch and a half long, and also one immediately across the nose, and one over the left eye and this large wound; I have had quite a number of cases of injury to the head, but not so extensive as this injury; as I stated before, I found that the part of the skull indicated here in the large wound was not there, and had been removed; that space that was gone covered a space of about three inches by two and a half; I put my finger in here above the right eye, and also put my finger in here; on the right side I found no resistance in the frontal lobe; I ran my finger back on the right side as far as the temporal sphenoidal a distance of about two and three-quarter inches; I then ran my finger towards the left to the bone on the opposite side, the edge of the frontal and temporal bone, right about here; I felt some resistance of course in there directly below that, going under the bone at that point; over the right eye I found that the bone had been broken loose and was ragged, and I also found that the skin was ragged; measuring the wound here, I found that something near six inches around the skin, and that is not quite going around three sides of the edges of the skin; after I had made an examination of the wound I made an incision here and pulled the skin back all around the wound so I could examine the bone and the brain, and I found a large projecting mass of blood mixed with brain and clot and so forth, which I removed; I found the clot and brain on the right side involved almost to the frontal lobe, and on the left side I would say at least half way back the frontal lobe, and the right half or right one-third at least of the frontal lobe, on the left side was entirely macerated; the frontal lobe extends back one and three-quarters inches; the temporal sphenoidal lobe is back of the frontal lobe below, and the parietal back of the frontal above; if I touched the parietal lobe it was only at the lower part and possibly in the neighborhood of the fissure of Sylvius; if I had taken a cord and laid it around the edges of this large wound it would have amounted to about five inches; I found the edges of that wound ragged and torn to the full extent almost; I don't remember how many torn places there were there, I didn't count them; then the skin had a similar appearance that extended across from the right to the left, almost across this wound; of course, it didn't extend exactly across, there was a little space in here where there was no skin; that had ragged edges, and also the space here and the space above and the space below that the skin didn't cover; that flap of skin was ragged the same as it was around the edge of the skin wound; I found a small skin flap cut off from that large skin flap; but I don't remember just the direction, and

I don't think I have got that in my notes that I have got with me; that was just a small tag of skin extending from this large skin flap; that small tag of skin was possibly a third or a half inch long; the skull at that place is very well braced on account of the extension and supraorbital plate; that portion of the skull is better braced than the sides of the skull, and really as well as the back—it is not as heavy as the back but it is as well braced on account of the supraorbital and nasal and sphenoid and temporal bones; I disrobed the body of the deceased and found seven distinct bruises; on the right arm one inch above this prominence here known as the ulna I found a bruise a little larger than a quarter; that was a blue or black wound; I found another bruise four inches above the elbow on the right arm, a black place possibly as large as a half dollar; four inches below this notch of the breast bone I found another bruise; that was a convex and curve, with the convexity up; then two inches and a half to the right of that, near the nipple, I found another bruise the size of a quarter; that was near the right nipple; above and below the left patella, or knee, I found two bruises, and on the right left here I found another bruise; I didn't observe any other bruises on the body; I made some examination around that porch; when I reached the home Sunday I found an iron bedstead sitting on the gallery, extending from the north to the south; I noticed the space between the bed and this house to be about 18 inches, and between the bed and the outer side of the porch was about twenty inches; I noticed that the two gallery posts, one at the head and one at the foot of the bed, were bloody, and there were prints on them; I could make out distinctly that someone had caught hold of those posts with bloody hands; I found that the floor here had evidently been washed with water and that coagulated blood filled up the cracks of this floor immediately on the side of the south end of the bed; coagulated blood is hard blood; I didn't see the sheet, and I know the pillow had been removed from the bed; I noticed that about half of this top mattress was saturated with blood, that was in an irregular shape, and I have a drawing of that; we removed that mattress, and we found that immediately below the pillow here there was a bloody space on the second mattress possibly extending out four inches between the mattress and the outer edge of that mattress was saturated with blood; I saw that the bed railing also was saturated with blood under that; I noticed that the vines back here east of the bed had several spots of blood on them; I noticed that a two by four plank immediately above that about seven feet and a half, that the under edge of that plank was spattered with blood; there was a space above the bed about twenty-seven or thirty-three inches where I think I counted between fifty and sixty blood spots; that was on the ceiling; those blood spots ran across the gallery, and leading out from those spatters of blood there would be little projections of blood and those projections extended over to the front and to the house side of the bed; those blood spots extended about thirty-three inches across the gallery here and about twenty-seven inches this way, almost immediately over and just a little to the north of the large spot of blood

on the top mattress; I also noticed blood some ten feet to the south of the bed, immediately above the door; there were a number of spatters of blood on the side of the wall; I don't believe I observed which way those spatters of blood were going; I noticed that two or three pieces on the side had been removed when I got there, the weather boarding or siding had been removed; the under side of the two by four plate of that gallery had spatters of blood immediately under it; I observed the ground close to the porch and saw clots of blood, and I think I saw small pieces of bone, and there was quite a large space that looked like water had been poured on it; this floor here looked like it had been washed up, judging by the amount of blood in the cracks and the absence of blood on the floor."

The sheriff testified that he arrested appellant that night and searched him when he "found a watch on him in his watch pocket, and a pocketbook with a Woodman receipt in it; I call this side pocket in the pants the watch pocket; that was a leather pocketbook of the purse style; I opened that pocketbook and found a Woodman receipt in it; I also found a couple of handkerchiefs stuck down in his back pocket; one of those handkerchiefs had a considerable amount of blood on it, and the other didn't have quite so much, the bloodiest one was in the bottom part of his pocket; I then took him out behind the house and stripped him and found that his underclothing was bloody, and there was a good deal of blood on his undershirt; I thought I put that underclothing in this grip; I found that the undershirt had a considerable amount of blood in front, spattered with blood, mostly on the left side, like that, in front; the right sleeve of the undershirt was nearly saturated in blood, and on the back of his shirt there were several drops of blood about his shoulders and just behind; I am pretty sure that the blood on his back was about along here, somewhere about the shoulder blades; his drawers were bloody, and there was a great deal of blood on his right knee, and I think there was some blood on the left one lower down; I removed his shoes and his socks and found that his feet were bloody."

The State introduced testimony showing several quarrels, all apparently growing out of the management of the two sets of children, and after one of these quarrels, proved by Clint Brown that defendant told him his wife was mistaken about him trying to get her to come back when she left the farm and moved to Brownwood; that she wanted to come back; "that she had talked to a lawyer or someone and made her wise and she was working he thought so as to get some of his property in some way, and he said that she was going to try to make it so hard for him and his family so that he couldn't put up with her and he would have to run her off and she thought by that that she would get some of his property." De Shazo and others testify to appellant's effort to sell the farm on which they were living, and when asked if his wife (deceased) would sign the deed, said she had nothing to do with it. It further appears that he had placed the farm with Noel Daniels, a land agent, for sale. On Wednesday before the homicide took place on Saturday night, Mr. Daniels and Mr. John Staton had stopped by and

spoke of trading for the farm. Appellant agreed to meet them in town and did meet them on Friday, and was to see them on Monday following to see if they could close a deal. A number of other instances were shown, showing quarrels.

Defendant introduced a number of witnesses who testified that they had seen them together on various occasions and that the most amicable relations seemed to exist between them, and it also was shown that prior to this homicide appellant had always borne a good reputation as a law-abiding citizen. On the trial he testified denying that he had inflicted the wounds, and admitting that several quarrels arose over the management of the children. He testified that he loved his wife, and to the most friendly relations, explaining how each of the quarrels arose that the State's witnesses had testified to. He also testified: "I am sure that my wife laid down in bed first that night; I was up during the night; at the time these injuries were inflicted on my wife I was lying on the side of the bed next to the wall, and I was lying on my right side; that would place me facing my wife on the east; I was up one time that night after I had laid down; I thought that I was just dozing; I had been up just a short time before that, I don't know just how long, and came back and lay down, and I heard something on the floor make a noise, and the next thing I heard was a blow, a lick right at me there, and I opened my eyes and looked up that way, and as I did a man was standing there making a stroke, coming down this way with his arm, with something that looked to me about that long in his hand, and I jumped to get up off of the bed, just jumped up off of the bed, and as I got to the foot of the bed I was straight, and I looked around that way and seen him, and I just says to him, 'You son-of-a-bitch, you,' and he advanced coming towards me, and I went towards the door of this north room; the door opened to the left and as I went in I jerked the door this way and the door was open and I looked out and saw the man pick up my pants and jump off of the gallery; as I jumped up off of the bed I felt something brush my hair, the wind of the instrument, and I heard it hit the wall; I don't know where the lick went to that he was striking when I opened my eyes, I jumped to get out; the thing was coming down and I was up before I heard the wall struck; I went in that room for my gun, and I got it; when I saw him jump off of the gallery I went and got my gun out of the closet and got my cartridges up on top of the closet and put them in my gun; I didn't put but one cartridge in my gun because the firing pin was broken out of the right hand barrel and the left hand barrel was the only one that would shoot; I didn't know for certain at that time that my wife was hurt; when I came out with the gun I looked and couldn't see anybody, and then the next thing that attracted my attention was my wife saying 'Oh Lordy, oh Lordy,' that attracted my attention, and she was sitting up in the bed with her head down this way, and I set my gun down and went to her; I didn't search any further for the man at that time because I didn't see anybody and I knew she was hurt and I went to her; I went to her and asked her what I could do for her, and I put my hand on

her forehead and felt the wound, but I couldn't see it, and she never gave me any answer; I asked her about three times what I could do for her, and the last time she told me to get a wet rag and put it on her head, she had a pain in her head, and I laid her down on the bed; I couldn't see at that time whether her head was bloody or not, the moon made a shade on her face, but I could feel the wound; I had hold of her and laid her down on the bed; the next thing that I did was to step to the door there and call Lloyd and told Lloyd about some-body knocking his mother in the head, and hollered for Cleola and told her to get up, and they all jumped up and came out there, and then I went to get a rag and they all went right with me to get the rag, and when we got in there Cleola found a rag, she got a rag out of the drawer of the safe, and so I got a pan of water and the rag, and I brought a lamp with me and lit the lamp; I then went to my wife and she was still groaning and making noises, and I just dipped the rag down in the pan and put it on her head, but I seen how bad she was hurt, and then I went right back in there and rang for the doctor; I phoned central and told central I wanted Dr. Tottenham and to tell him to get there as quick as he could, to come in an automobile, a burglar had knocked my wife in the head and tried to kill me; I then turned around and rang Beeman and told Beeman the same words, and went right back to my wife, and when I got back out there she just raised right up and strangled and vomited all in her lap and blood gushed everywhere; when she was doing that I was right at her back, I just caught hold of her shoulders; the vomiting of the blood fell right in her lap, and she strangled and kept strangling and vomiting right on the edge of the bed and right on the floor there and in her lap; after she did that I laid her back down on the bed; when I laid her down I put the wet rag on her head, and she says, 'Take it off, take it off,' this way with her hand; I thought she meant the rag, and I raised it up, and I says, 'Take what off?' and she says, 'Those plasters,' and she says, 'Come to me, come to me,' and I says, 'I am here,' and she says, 'Come to me, I am going to die'; I says, 'Who come to you?' and she says, 'That woman'; the chil-dren commenced crying then, and she says, 'Don't cry,' and I don't remember for certain whether she said children or not, but she says, 'Don't cry,' and .then she said a number of words that I never could understand distinctly; during all that time I was just dressed in my undershirt and drawers; when I was holding her up there, I was so excited that I don't remember whether any part of my body or arm was against her or not; I don't know whether I got blood on me while that was going on or not; but I guess I did; I saw some blood on me after-wards; I was bare-footed at that time; I washed off some of the blood on that floor—as she quieted down and I got her sorter settled down I noticed myself standing in that blood, and I expected the doctor and Mr. Beeman to come any minute, and I just picked up what was left in the pan of water and just poured it down there, and just got around there and put my hand on the gallery post and raked it off the floor

this way with my right hand; I used all of that water, and then I went out and got some more water in the pan and set the pan down there; after I stepped in that blood, I went into that north room to get my pants, I was naked and I got my pants and put them on; I hadn't been dressed until Mrs. Beeman came, and then I went into that north room and got my pants; my shirt was lying out here on a chair, and when I came out I put that shirt on and put my vest on; my shoes and socks were right there, and I put them on; I put my shoes on without washing my feet; Mr. and Mrs. Beeman were the first parties to come there." And then his testimony as to what he told Dr. Tottenham and Mr. Beeman is in substance the same as their testimony.

This gives a rather full but general statement of the case, and in disposing of the different bills of exception the matter will be further presented.

The first bill of exceptions complains of the action of the court in overruling the motion for a continuance. As to the witness McRae, it appears that no process had ever been issued for said witness, and his residence at the time of this trial was unknown, and the diligence was, therefore, insufficient. The alleged testimony of the witness Mrs. Mollie Tyler is hearsay, and would not have been admissible had she been in attendance. Neither would the testimony of Mrs. Rimmer be admissible. The attendance of the other witnesses named in the application was procured, and there was no error in overruling the application.

Appellant objected to that portion of the testimony of Dr. J. W. Tottenham where he testified about making a test with the iron rod to see if one could strike the wall and make the indentation in the wall, striking where the defendant said the man he claimed struck the blow stood. It is true that Mr. Beeman testified on cross-examination that when Dr. Tottenham arrived and went to go behind the bed he "pulled the head of the bed out *just a little way* from the wall towards the porch," so the doctor could go behind it. The doctor testified positively the bed was not moved after he arrived until the experiment was made, and no other witness testified anything about the bed being moved except Mr. Beeman, and his testimony considering the testimony of the doctor might go to the weight to be given it by the jury, but would not render it inadmissible. But this is not all the testimony in the record. Hard Daniels, deputy sheriff, testified he told appellant, " 'Mr. Brown, I want to get right on the scene where this tragedy occurred,' and he then pointed here to the bed; we were all on the porch, and he says, 'Right here,' and pointed to the bed, and then walked and showed me on the east side where the burglar stood. . . . Then he asked someone to hand him the iron, and when it was handed him, and he reached over Mrs. Brown to see if he could strike the wall with the instrument; that he stood *exactly where Mr. Brown* (appellant) told him *the burglar stood,* as near as he could." That Dr. Tottenham also made the experiment, and if they stood exactly where Mr. Brown said the man stood it would be immaterial whether or not the bed had or had not been slightly moved. He also testified to other experiments, and that Dr.

Tottenham fitted the iron in the indenture in the wall; that they would not fit with a man standing on the east side of the bed where Mr. Brown said the burglar stood, but one had to go around to the *head of the bed,* and then the *taps fit those indentations.* These indentations, he says, were on a level with the bed, and that they could not have been made with the rod by a person standing at the *east side of the bed,* but for the nuts on the rod to fit the indentures in the wall one would have to stand at the *head of the bed.* That there were two of those indentures or marks on the wall about a half inch apart. The testimony of this witness, together with that of Dr. Tottenham, clearly renders these experiments, made there on the ground that night, standing where appellant said the man stood, admissible, and if the jury gave credence to the testimony it proved that a man standing by the east side of the bed could not have struck the blows that made the indentures in the wall, because the nuts on the iron bar could not be made to fit in the indentures from the side, but when one got to the head of the bed the nuts fit in the indentures to a nicety. Mr. Branch, in his work on Criminal Law, well states the rule to be: "If experiments as to any disputed fact, testified to at the trial, appear to have been made under conditions similar or *approximately similar* to those which surround the original transaction, and such experiments would serve to shed any light upon that transaction, proof of the results of same is admissible. Speers v. State, 55 Texas Crim. Rep., 368, 116 S. W. Rep., 568; Clark v. State, 38 Texas Crim. Rep., 30, 40 S. W. Rep., 992; Schauer v. State, 60 S. W. Rep., 249; Martin v. State, 40 Texas Crim. Rep., 660, 51 S. W. Rep., 912; Hodge v. State, 60 Texas Crim. Rep., 157, 131 S. W. Rep., 577."

In the next bill of exceptions it is shown that on cross-examination the defendant propounded to the witness Viola Wilson the following question: "Haven't you heard your mother say that if it were not for the children they would get along all right?" The objection of the State was sustained, that this would be hearsay testimony. Defendant in the bill alleges that he "expected" to prove that she heard her mother so say, whereas to have rendered the bill sufficient, what could and would have been proven by the witness should have been stated. But the record as a whole discloses, both from the standpoint of the State and the defendant, that all the troubles testified in regard to arose over differences about the children, but this testimony was given by persons who heard the altercations and had a personal knowledge of the matters, and not what they heard someone say. What Mrs. Brown may have said about the cause of the troubles between her and her husband, made long before the homicide, would not be admissible either for or against the defendant. The rules of evidence are the same, whether for the State or defendant, and to open the door this wide, one could see the incalculable damage if the ex parte statement of the deceased made long prior to the homicide could be introduced in evidence to establish or disprove motive. What Mrs. Brown had said as to the cause of the troubles theretofore existing would be hearsay. Defendant denies being

the responsible agent for her death, and as this character of testimony could not be used for any purpose except to prove or disprove motive, and being purely hearsay statements, the court did not err in excluding it.  This under any and all circumstances would but tend to show her opinion of the causes, and would not in the least tend to show what actuated the defendant, if he in fact committed the crime.  Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328, and cases there cited.

This homicide took place in September, 1911.  It is made to appear that some five or six years prior to this time she had quit her former husband, L. H. Brown, and that she fled from him at that time with her young son, Floyd Brown.  It further appears that in 1909 she sued for and obtained a divorce from L. H. Brown, he being served personally with citation; that L. H. Brown had again married and was living in Comanche County with his then wife, while deceased was living with appellant, George Brown, as her husband in Brown County.  The record further discloses that L. H. Brown was at his home in Comanche County on the night of the homicide, three witnesses testifying to this fact, and no witness testifies to L. H. Brown ever having been in Brown County prior to this homicide, nor at any time thereafter until summoned as a witness in this case.  However, defendant on cross-examination sought to prove by Viola Wilson that in 1906, while they were living in San Saba County, that she heard her mother, deceased, say she thought she had seen L. H. Brown in Richland Springs where they were living. They do not state they expected to prove that L. H. Brown was in fact in that town, and if so he at any time from 1906 to 1911 ever sought the whereabouts of deceased, although it is conclusively shown that he knew her whereabouts from 1909 to the date of her death, and that she had married appellant.

By Hardie Graham defendant offered to prove that in 1906, while Mrs. Brown was living in Richland Springs she asked who a certain man was, and he told her he did not know; that she looked excited, and said she thought it was her former husband, L. H. Brown, and he had said he was going to have their youngest child.  He further stated he could not identify L. H. Brown in attendance on court as the man. By J. B. Miller it was stated that they could prove that while she resided in Richland Springs in 1906 or 1907 she purchased a shotgun, and asked if it would kill a man, not naming the man.  By N. T. Chamberlain it was stated that in 1906 he was deputy sheriff of San Saba County, and someone called him over the telephone and gave his name as Brown, and asked him "if he knew a lady there with three children, two girls and a little boy," and upon being answered in the affirmative, stated he was coming over there to get the little boy, but if he ever came he never learned of that fact, and that he did not know the party doing the talking.  J. B. Nawls would have testified if permitted that in 1906 he was deputy sheriff of San Saba County; that Mrs. Brown had lived with Mrs. Abbott, and that a day or two after Mrs. Brown had moved away from the home of Mrs. Abbott, someone entered her home at night

and turned the light out. No testimony was introduced to connect L. H. Brown with this matter, only that Mrs. Brown had once lived with Mrs. Abbott. They also desired to prove the same fact by Mrs. Abbott, and that about this time a strange man called at her home, claiming to be a "piano man." She could not identify L. H. Brown, who was in attendance on court, as that man. By Dr. Rimmer it could have been proven that while Mrs. Brown was residing in San Saba County in 1906, he was called to her home at night, and she objected to a lamp being lit, stating that she and her former husband, L. H. Brown, were separated, and he had threatened her life, and had said he was going to have the little boy or kill her. We have elected to treat all these bills jointly, as they all cover the same period of time, and all relate to the year 1906, five years prior to the homicide. If L. H. Brown did at that time make the threats, and deceased feared him and feared that he would take their little boy, and was in hiding from him, this was just after their separation and for five years thereafter, three years of the time knowing where his wife and child were, it is not shown, nor was it offered to be shown that he had said or done one thing to secure the possession of the child or made any effort to see Mrs. Brown. But does the testimony show that it was L. H. Brown who was the piano man that called at Mrs. Abbott's home? No, and if it was he made no effort to see or locate Mrs. Brown. Does any testimony show that it was L. H. Brown who entered the home of Mrs. Abbott at night, where Mrs. Brown had formerly lived? No. In fact it was not proposed to show that L. H. Brown was in fact the person who did any or all of these things, and the court did not err in excluding the testimony. If it should be conceded that at this time in 1906 just after L. H. Brown and his wife had separated, he had in fact made the threat "that he would have the little boy or kill Mrs. Brown"; that he in fact went to San Saba and in the night time entered Mrs. Abbott's home after Mrs. Brown had left; that he represented himself to be a "piano man," and went to her front gate; that he did in fact search for Mrs. Brown and the boy, and talked with the sheriff; that at that time Mrs. Brown feared him and bought a gun and was trying to keep it concealed from him, yet it affirmatively appears in the record that L. H. Brown for three years prior to the homicide knew her whereabouts, and she, by suing for a divorce, made it known to him by having him served with a citation; that he made no effort to get the child; had married him another wife, and settled down in Comanche County; the defendant did not state he expected to nor offer to prove that subsequent to 1906 for five years, L. H. Brown did anything, or said a word relative to deceased, and these remote circumstances would not be admissible to show that in September, 1911, perhaps L. H. Brown may have been the man who killed appellant's wife, in view of the fact it was not shown nor attempted to be shown that L. H. Brown on September 9, 1911, the night of the homicide, or any time prior thereto, was in or had ever been in Brown County. In the case of McCorquodale v. State, 98 S. W. Rep., 879, our presiding judge correctly states the

rule to be: "That investigations with reference to other parties than the accused would not be permitted, unless the inculpatory facts are such as proximately connect the party not on trial with the transaction. In other words, if a party other than the accused had the motive and opportunity, and was placed in such proximity to the homicide as to show he may have been the guilty party, the evidence may have been introducible; but remote acts and threats would not be, unless other facts in closer proximity and pertinently connecting the third party with the homicide at the time of the commission of the offense were shown. The mere fact that deceased may have had animus is not sufficient. The mere fact that deceased had threatened to kill other parties is not sufficient to admit it, unless there are other facts to show that the third party may have been placed in such position that he may have committed the homicide." Not only do the facts not bring the above testimony within the rule above announced, but the record affirmatively shows that L. H. Brown was in Comanche County at the time of the homicide and was not and could not have been in Brown County at that time. In Wallace v. State, 46 Texas Crim. Rep., 341, 81 S. W. Rep., 966, this court, speaking through Judge Henderson, says: "We do not believe it was competent for the appellant to prove that deceased, Austin, had certain enemies, and that he was apprehensive of harm from them. The evidence was too remote; the rule being that, before testimony of this character is admissible, the evidence must tend at least to some degree to show that such other person did the killing. The mere fact that other parties may have entertained feelings of hostility or ill will or had made threats against deceased will not be sufficient." In the case of Kunde v. State, 22 Texas Crim. App., 65, this court, speaking through Judge Willson, overrules a number of cases, and states that evidence that perhaps another committed the crime was admissible, as such person is shown to have been in such proximity that it was possible for him to have done so. The opinion reads: "We presume that the learned trial judge rejected the proposed testimony upon the authority of Bowen v. The State, 3 Texas Court of Appeals, 617; Boothe v. The State, 4 Texas Court of Appeals, 202; Walker v. The State, 6 Texas Court of Appeals, 576; Holt v. The State, 9 Texas Court of Appeals, 571; and perhaps some other early decisions made by this court. The doctrine of these cases, in the broad terms therein announced, while perhaps sustained by the weight of authority, at the time the decisions were made, is no longer the doctrine recognized by this court, and by what we consider the weight of authority of the present day. That is, the rule announced in those cases has been qualified and very much modified by recent decisions, and is not the rule which now obtains. (Dubose v. The State, 10 Texas Crim. App., 230; Hart v. The State, 15 Texas Crim. App., 202.) In McInturf v. The State, 20 Texas Court of Appeals, 335, it is said, 'the rule now established is that investigation with reference to other parties than the accused should not be permitted in cases either positive or circumstantial, unless the inculpatory facts are such as are proximately connected with the transaction. In other

words, to show remote acts or threats would not be admissible unless there were other facts also in proof proximately and pertinently connecting such third party with the homicide at the time of its commission.' (Citing Means v. The State, 10 Texas Crim. App., 16; Aikin v. The State, id., 610; Hart v. The State, 15 Texas Court of Appeals 202, 522; see also 15 Lea, Tenn., 694, a case in point.)"

In this case there is no testimony placing L. H. Brown in Brown County that night, or in such proximity to it that it would have been possible for him to have committed it, nor did the defendant state when he offered the testimony he expected or thought he could make such proof. The rule as stated in the Kunde case, supra, has never been broadened nor enlarged, but has been always followed since its rendition, as is shown by the Wallace and McCorquodale cases and many others that could be cited. The court permitted those witnesses who heard L. H. Brown say anything in the premises to testify to such matters; permitted the return on the citation issued in the case wherein Mrs. Brown sued L. H. Brown for a divorce to be introduced, and the judgment of the court where a divorce was decreed at the instance of appellant. This return shows the citation to have been issued and served in 1909, while the decree of divorce shows it to have been granted and entered in December, 1909. The court did not err in excluding the allegations in the petition and citation as grounds for the divorce, as these would be but the ex parte statements of Mrs. Brown, and the defendant did not attempt to nor state that he would offer any evidence that L. H. Brown had become offended at the allegations contained therein, or that after being served with a copy of the petition and citation he made any effort to see Mrs. Brown or obtain the child, or that he ever was in Brown County after being served with the citation, until he was summoned as a witness in this case after the death of Mrs. Brown. These are all the bills of exception in the record except some that relate to statements of Mrs. Brown, and we will treat of them altogether.

By Mrs. Minnie Thomas he states he expected to prove that Mrs. Brown about a year before the homicide, had stated to her that she and appellant were not separated at the time she was living in Brownwood; that she loved Mr. Brown (appellant) and the children were the cause of the trouble between them. By E. I. Drinkard, Mrs. E. I. Drinkard and Berney Brown, about eleven days before the homicide they had heard Mrs. Brown state that appellant had rescued her when she was in the creek bathing and was about to drown; by Mrs. Drake, that some time before the homicide she was talking to appellant, and appellant told her he would not allow Mrs. Brown to drive a certain horse, and she (his wife) got hot about it, but would get over it; that he would not let her drive the horse because it would kill her. Appellant was himself permitted to testify to all facts, and testified to all these circumstances, but the insistence is that the witnesses named should have been permitted to testify to what they heard Mrs. Brown say, and in the last instance Mrs. Drake to testify what she had heard defendant

say some time prior to the homicide. The last would, under all the authorities, be but a self-serving declaration, not made at a time to be res gestae of the offense, but made some time prior thereto, and under no rule of law we know of would it be admissible. As to the witnesses Mrs. Thomas, Mr. and Mrs. Drinkard and Berney Brown, it was as to statements of Mrs. Brown. Even if Mrs. Brown had stated she loved her husband, would that be any evidence that her husband (appellant) loved his wife? Appellant cites no authorities from this State holding such testimony admissible, but cites some from two other States, one being from Missouri, where the court at one time held the testimony admissible, then overruled the decision, saying no authorities sustained the former opinion. So that it appears that the opinions of the courts of that State would be of no weight unless the reasons therein stated should have foundation in the well-settled principles of law, and this, we think, the opinion in the Leabo case does not show, but demonstrate an effort to engraft a new rule of evidence, to which the great weight of authority is opposed. As stated in some of the opinions, suppose instead of charging appellant with the murder of his wife, he had been charged with making an assault with intent to kill her, it would not be seriously contended that if his wife was living, anything she might have said in regard to their relations to the above named witnesses would have been admissible as original testimony, but if it was desired to introduce such testimony it would have been necessary to place her on the witness stand. This we understand to be the rule under all the authorities, and if the testimony of these witnesses would be inadmissible as original testimony if she was living, on the ground that it would be hearsay, then her death would not change the character of testimony, but it would still be what is termed hearsay testimony. It is true that statements of this character when made at a time to be res gestae of the transaction, or made at a time when death was impending, are admissible. But in this case there is no contention that these declarations were made under either of those conditions, but it is shown beyond the peradventure of a doubt that they were made long before the homicide while she was apparently in perfect health. When the declarations or statements of a deceased, not made under the above conditions, are admissible, has been the subject of much discussion by members of this court at various times, and in the Cline case and other cases it was held that they would not be admissible under any other condition than the two exceptions above stated, even though made under the sanction of an oath, but the general rule is, and which has been finally adopted by this court, that when such declarations are made under the sanction of an oath, and the opposite party had an opportunity to cross-examine the witness, then such testimony was admissible under those conditions after death, but we know of no other exception to the rule than the three above recited as applicable to the facts in this case, and the testimony offered is not brought within either of them, but the statements offered to be introduced in evidence were ex parte in their nature, and purely hearsay. In the case of Tomerlin v. State, 26 S. W. Rep., 66, this court says:

"The court did not err in refusing to admit the evidence of Mrs. Bass, offered by defendant, that deceased on the day after being shot, stated to her, if defendant shot him, such shooting was accidental, because they had been good friends, and defendant had no cause to shoot him." The court held this inadmissible because it was not a dying declaration, was not res gestae of the transaction, and was hearsay, although it would have a strong bearing on whether or not the appellant in that case had a motive, etc. See also Harris v. State, 1 Texas Crim. App., 74; Estes v. State, 23 Texas Crim. App., 600; Segura v. State, 16 Texas Crim. App., 221; Chumley v. State, 20 Texas Crim. App., 547. The court permitted Berney Brown to testify to what he knew of his own knowledge, and only excluded what he said had been told him, and as to facts which he did not claim to have any personal knowledge; permitted Mr. and Mrs. Drinkard to testify as to what they knew and had observed as to the friendly relations existing between appellant and his wife as tending to disprove motive, and only excluded what they would have said they had no personal knowledge but had only been told. Mrs. Drake did not pretend to know any fact of her own knowledge, but would only have recited a statement of defendant. Any and all persons who knew or pretended to have any knowledge as to any and all of the matters were permitted to testify to such facts, the court only excluding what they would have testified "they had been told," and he did not err in so doing.

Floyd Brown testified he was asleep when his mother was struck the blows, but was awakened by appellant, and when he went out on the gallery deceased said, "Take those plasters off of my eyes." The State introduced witnesses who testified that Floyd Brown had told them his mother did not speak after he awoke. The defendant then introduced Mrs. Beeman, who testified that she was called to the home in about a half hour or such matter after the injuries had been inflicted, and that Floyd Brown then told her about his mother making the statement to him he had testified to on this trial. On this phase of the case the court instructed the jury:

"You are instructed that any testimony, if any, to the effect that Lloyd Brown and Cleola Brown stated that Sallie Brown, deceased, did not speak after her injuries, can. not under the law be considered by you as any evidence that Sallie Brown did not speak or talk after her injuries, but can only be considered by you, if at all, in weighing the credibility of said Lloyd Brown and Cleola Brown as witnesses.

"You are instructed that the testimony of Mrs. Beeman concerning statements made by Lloyd Brown to her,—that even though you believe such statements were made to the effect that the deceased, Sallie Brown, spoke or talked after receiving her injuries, that you can consider such testimony only in support of the credibility of said Lloyd Brown as a witness, and you can not consider said testimony of Mrs. Beeman as any evidence whatever that the deceased, Sallie Brown, did in fact speak or talk after the injuries were inflicted upon her."

Appellant claims that the latter part of this charge is upon the weight

of the testimony, and it was improper to instruct the jury that they could consider the testimony of Mrs. Beeman only in support of the credibility of the witness Lloyd Brown, and cites us to the case of Ball v. State, 38 S. W. Rep., 448. In that case it is clearly shown that all this testimony was clearly admissible, and admissible solely for the purpose of discrediting or supporting the testimony of the witness Lloyd Brown, but it is insisted that it is upon the weight to be given the testimony. If this should be true, it would be a matter of which he could not complain. The court told the jury that if they believed Lloyd Brown told Mrs. Beeman that his mother did speak they could consider the testimony in support of the witness. If this be upon the weight of Mrs. Beeman's testimony, it was an error in favor of defendant in telling them they should so consider it. In instructing the jury that they could not consider the testimony of Mrs. Beeman as any evidence that Mrs. Brown did in fact speak, the court is perhaps subject to some criticism. What Lloyd Brown told Mrs. Beeman would not be admissible as original testimony, and only became admissible in support of the witness after the State had introduced witnesses who testified to contradictory statements to affect his credit, but if they believed that Lloyd Brown in a half hour or an hour after the injuries were inflicted told Mrs. Beeman that his mother had spoken, it would have a strong tendency to cause them to believe that he was telling the truth about the matter, and of necessity, under such circumstances, have some weight in determining the issue as to whether she spoke or not. While it is true that Mrs. Beeman's testimony would not be admissible to prove that Mrs. Brown did speak after being injured, yet, as before stated, it would, of necessity, if they believed Mrs. Beeman's testimony, have some weight with the jury in determining the issue, and it would have been proper for the court to have omitted that part of the paragraph. But is appellant in any condition to complain of this charge? As to the testimony introduced by the State to prove that Lloyd Brown had stated his mother did not speak on that occasion, the appellant requested the court to charge the jury: "You are instructed in this case that the testimony of the witnesses Early, McGaugh and Denman concerning statements of witness Lloyd Brown, in the office of Early at Brownwood,—that even though you believe such statements were made to the effect that deceased made no statement, that you can consider such evidence only for impeachment purpose, and that you can not consider said testimony of said Early, McGaugh and Denman as any evidence whatever that the deceased Sallie Brown did not in fact speak and talk after the injuries were inflicted upon her." In pursuance of this request of defendant, the court embodied this special charge in his main charge, and having requested this rule of law to be applied to this character of testimony, if the court erred in so doing, the appellant will not be heard to complain as it was at his instance and invitation that the court applied this rule of law to this character of testimony. In the case of Cornwell v. State, 61 Texas Crim. Rep., 122, this court held: "It is a general rule of law that when counsel has requested the court

to charge a given proposition of law and it is given, such error can not be taken advantage of by the party whose counsel made the request." In this case will be found a long list of cases cited both from this State and other States so holding, and as we understand the law has always been the rule in this court and in our Supreme Court. Again, if it had not been requested by appellant, would it be such error as would call for a reversal of the case? If Mrs. Brown spoke after she received the injuries nothing, it is claimed, she said would even tend to show whether or not appellant was the person who inflicted the injuries, and that was the question to be tried in this case. It can not be contended that any remark she made, if she made any, would throw any light on who struck the fatal blows, consequently under no circumstances in this case would this paragraph of the court's charge present any harmful error.

It is contended by appellant that the "eighth paragraph of the court's charge authorized the jury to find appellant guilty of murder in the first degree upon either express or implied malice." Said paragraph reads: "In order to warrant a verdict of murder in the first degree, malice must be shown by the evidence to have existed,—that is, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the killing was a consummation of a previously formed design to take the life of the person killed, and that the design to kill was formed deliberately, with a sedate mind, that is at the time when the mind of the person killing was self-possessed and capable of contemplating the consequences of the act proposed to be done. There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing. A single moment of time may be sufficient. All that is required is that the mind be cool and deliberate in forming its purpose, and the design to kill is formed." A reading of this paragraph shows that the complaint is without foundation. The court's charge as a whole in presenting murder in the first degree is clothed in language frequently approved by this court. For a citation of authorities see Branch's Criminal Law, sections 419-420.

This was a case of circumstantial evidence, and the court instructed the jury:

"In this case the State relies for a conviction on circumstantial evidence alone. You are instructed that in order to warrant a conviction of a crime on circumstantial evidence, each fact, necessary to the conclusion sought to be established, must be proved by competent evidence, beyond a reasonable doubt; all the facts (that is the necessary facts to the conclusion) must be consistent with each other and with the main facts sought to be proved; and the circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no other person, committed the offense charged.

"But in such case it is not sufficient that the circumstances coincide with, account for and therefore render probable, the guilt of the defendant. They must exclude, to a moral certainty, every other reason-

able hypothesis except the defendant's guilt, and unless they do so, beyond a reasonable doubt, you will find the defendant not guilty." The criticisms of this charge are without merit, and the charge as given has been so frequently approved by this court it almost seems unnecessary to cite authorities, but see Ramirez v. State, 43 Texas Crim. Rep., 455; Bell v. State, 71 S. W. Rep., 24; Baldez v. State, 37 Texas Crim. Rep., 413; Boggs v. State, 38 Texas Crim. Rep., 82; Trevino v. State, 38 Texas Crim. Rep., 64; Blount v. State, 64 S. W. Rep., 1050; Reeseman v. State, 59 Texas Crim. Rep., 430, 128 S. W. Rep., 1126; Mosely v. State, 59 Texas Crim. Rep., 90, 127 S. W. Rep., 178.

As the State introduced the statements of the defendant on the night of the homicide, that he had just returned to his bed, and was dozing when someone came in on the gallery, and struck Mrs. Brown one or two blows, the court instructed the jury: "You are instructed that when the statements or declarations of a defendant are introduced in evidence by the State, then the whole of the declarations or statements are to be taken together, and the State is bound by them, unless they are shown, by the evidence, beyond a reasonable doubt, to be untrue; such statements or declarations are to be taken into consideration by the jury as evidence in connection with all other facts and circumstances of the case. But in this connection, you are instructed that the State is not bound to prove the falsity of such statements or declarations by positive testimony, but the same may be shown to be false by circumstantial evidence." There are several criticisms as to this charge, the first being that the part wherein the court instructed the jury, "But in this connection, you are instructed that the State is not bound to prove the falsity of such statements or declarations by positive testimony, but the same may be shown to be false by circumstantial evidence," is erroneous, in that (1) "it is upon the weight of the testimony; (2) it is misleading and calculated to prejudice." The second ground that "it is misleading and calculated to prejudice," is too general to point out any error, if error there had been. (Sue v. State, 50 Texas Crim. Rep., 129; Quintana v. State, 29 Texas Crim. App., 401; Holmes v. State, 55 Texas Crim. Rep., 331; Duncan v. State, 55 Texas Crim. Rep., 168; Pollard v. State, 58 Texas Crim. Rep., 299.) The other ground, that this part of the charge "was upon the weight of the testimony" was so thoroughly considered by this court in the case of Beeson v. State, 60 Texas Crim. Rep., 39, we hardly deem it necessary to do so again. In telling them that the truth or falsity of a given fact may be proved by circumstantial evidence as well as positive testimony is no indication that it has been so proven by either character of testimony. It is but the statement of a proposition of law that all recognize to be true,—that any fact can be proven as well by circumstantial evidence as positive testimony. This precise question was presented in the case of Kugadt v. State, 38 Texas Crim. Rep., 681, 44 S. W. Rep., 989, and we held adversely to appellant's contention, as well as in the case of Franklin v. State, 37 Texas Crim. Rep., 312, 39 S. W. Rep., 680.

While not specifically presented in the motion for new trial, yet it is

urged in this court that this charge is not specific enough in informing the jury what portion of appellant's statements must be shown to be false,—that is, that the portion of the statement which is exculpatory in its nature must be shown to be false. As stated before, this ground is not urged in the motion for new trial, and we think the charge as given is sufficient, but be that as it may, the court at the request of appellant gave the following special charge: "You are further instructed concerning the statements of defendant, if any, about how the deceased was injured, that the burden of proof is upon the State to prove beyond a reasonable doubt the falsity of said statement, and proof of the falsity of said statement, if any, in immaterial matters is not sufficient but the State must prove the falsity of every statement, if any, made by defendant, which in your mind raises, if any, a reasonable doubt of his guilt." If the main charge as given was subject to any criticism, certainly when the court gave this special charge there could be no further ground of complaint that the charge was not sufficiently specific in instructing them that all exculpatory statements which raised in their minds a reasonable doubt of his guilt must be proven to be false. The third ground is that this portion of the charge, and no other part, did sufficiently present the contention made by appellant, that another person may have killed deceased, and if the jury had a reasonable doubt of that fact he should be acquitted. What testimony is there that raises this issue? The statements of defendant on the night of the homicide, and his testimony on the trial. There is no other witness who testifies to any fact which would raise that issue. The court first instructs the jury on circumstantial evidence, and tells them: "It is not sufficient that the circumstances coincide with, account for and therefore render probable the guilt of defendant. They must exclude, to a moral certainty, every other reasonable hypothesis except the defendant's guilt, *and unless they do so beyond a reasonable doubt they will acquit the defendant.*" He next tells the jury they must take into consideration the statements and declarations of defendant, and the State is bound by them *unless they are shown beyond a reasonable doubt to be untrue.* He then gave the special charge hereinbefore copied, and appellant asked no other charge on this phase of the case, the complaint being first made in regard to this matter in the motion for new trial. Under our decisions this would be timely, if the matter had not been sufficiently presented in the charge, and special charges as given. If the defendant's testimony on the trial had been different or presented any new defense other than the explanation or statement given by him on the trial, or had there been any other testimony adduced on the trial other than the testimony of defendant himself, raising the issue that some other person committed the crime, there might be merit in this last contention of appellant. But as there is no evidence in the record tending to show that another committed the homicide other than the testimony of appellant, and his statements on the night of the homicide, the charges as given sufficiently presented the affirmative defense as raised by the testimony. Had he desired a more specific presentation

of this issue he should have requested that it be done. In Johnson v. State, 50 Texas Crim. Rep., 116, 96 S. W. Rep., 45, this court says: "There are cases which hold, where an explanation was given at the time, and the same statement is testified to on the trial as appellant's defense, that a charge on explanation would be sufficient, as it presented the matter," and we think this the correct rule, where more specific instructions are not requested. In the case of Hodges v. State, 6 Texas Crim. App., 615, this court said: "The rule is that when the court has charged on a given subject, and the counsel deem the charge insufficient, he should ask additional instructions on the subject," and in the case of Crutchfield v. State, 7 Texas Crim. App., 65, this court again said: "When the court has charged the jury as to the law of the case on trial before it, and there is no error in the charge as given, and counsel shall deem the charge defective in that it does not sufficiently present a given issue, it is their privilege and duty to request a further charge on that particular subject, and in that case it was further said that finding no special charges requested on the subject to which complaint was made, the court would conclude that the charge as given was satisfactory at the time. Many other cases might be cited rendered prior to the amendment of article 743 of the Revised Code of Criminal Procedure. And since that article was amended so as to provide that we should not reverse a case, even though an error be pointed out in the motion for new trial, unless it was such an error as resulted in injury, the rule announced in the Hodges and Crutchfield cases, supra, has been the prevailing rule in this court. The appellant in his statement on the night of the homicide, or in his testimony on the trial, named no person as the one who inflicted the injuries on his wife, but stated as he aroused from dozing a man was standing by the bed, whom he did not know, struck his wife. The court tells the jury that if they do not find this statement to be false beyond a reasonable doubt they will acquit defendant. And then charges the jury in addition to the charges hereinbefore copied, that this defendant was presumed to be innocent until his guilt was proven beyond a reasonable doubt, and in case they had a reasonable doubt of his guilt to acquit him. Would their minds have been more pertinently directed to defendant's defensive theory had the court instructed the jury, "if you believe some person other than defendant killed Mrs. Brown or you have a reasonable doubt of that fact you will acquit the defendant," than it was by the charges as given by the court? This whole defensive theory was embodied in the statement made to Becman, Dr. Tottenham and others on the night of the homicide, and the court instructs the jury that if the falsity of this statement is not shown by the testimony beyond a reasonable doubt to acquit. The defensive theory in the case is presented in the charge of the court in a way that the jury is specifically informed that if it is true, or they have a doubt as to its truth or falsity, the defendant is entitled to an acquittal. The fact that it is not presented in just the language the defendant states in his motion for new trial he would have preferred to have it presented, will not present error. Had his defensive theory

not been presented in the charge as given, of course it would present error, but as it was presented in a way that no jury could have misunderstood its meaning or application to the evidence, this assignment presents no error.

These are all the complaints of the charge as given, but appellant complains that the court erred in not giving his special charge in which he requested the court to charge the jury, that because appellant was charged with killing his wife the law indulged an additional presumption of innocence because of this relationship. This is not the law, and the court did not err in refusing this special charge. Cyc., vol. 12, p. 385, and cases cited.

Two of the other special charges requested were fully covered by the court in his main charge, the court's charge being drawn in terms frequently approved by this court; while as to the one relating to the remarks of the district attorney, there is no bill of exceptions in the record showing that such remarks were made.

There is one other ground in the motion for new trial perhaps that might be referred to. It complains that the court erred in receiving the verdict and entering judgment in this case, the contention being that the term had expired and the court was without authority to extend the term. The Legislature in 1909 provided for extending a term under certain contingencies, said Act being now article 1726 of the Revised Statutes. It reads: "Whenever a District Court shall be in the midst of the trial of any cause when the time fixed by law for the term shall expire, the presiding judge may extend the term of court until the conclusion of such pending trial." Under our Constitution we think the Legislature had the same authority to extend this power as it did to authorize the calling of special terms of court, and this question has been frequently held by this court adversely to appellant's contention.

Very able briefs have been filed by both counsel for the appellant and for the State, and they have been very helpful to us in thoroughly understanding the real issues in the case. Appellant does not contend that the testimony as to what Mrs. Brown told the witnesses is supported by any of the decisions of the courts of this State, but insists that the contention is supported by some cases from other States which he cites. While not taking up and discussing each of them, yet we have read such of them as are at our command and think a number of them not subject to the construction seemingly placed on them by appellant's able counsel, while at least one of them has been overruled by the court rendering it. Appellant cites us to the case of Leabo v. State, 84 Mo., 168, among others, this case being overruled by the Supreme Court of Missouri in the case of State v. Punshon, 27 S. W. Rep., 1111, and in which a number of the cases relied on by appellant are discussed, it being demonstrated that they do not sustain this contention, and are not subject to the construction sought to be placed thereon, the court saying, "It is thus seen that the principal case (Leabo v. State) is not supported by the authorities cited, nor any other authority that we have been able to find, and should be overruled." Appellant, in our

opinion, makes the mistake of thinking it material in this case to prove the state of feeling of deceased. In this character of case where one was murdered by someone while she slept, her state of feelings would not be a material inquiry. Deceased was not being tried, but it was appellant, and it was his act, conduct and state of feeling that was an issue in the case, and if deceased did love him, this would not prove nor tend to prove that he loved her.

Again appellant contends that the case of Dubose v. State, 10 Texas Crim. App., 230, and cases following that opinion, is authority for admitting what the San Saba County witnesses would have testified occurred in 1906. As stated heretofore, neither appellant nor L. H. Brown are in any way connected with such matters except by surmise, but if it should be conceded that L. H. Brown was the party who went to San Saba and Richland Springs in 1906, the opinion in the Dubose case and the cases following it would not authorize admitting the testimony as contended by appellant. In those cases we think it is correctly held that a person charged with homicide may show as a defense that another did the killing if he can do so, but in all those cases it is held that before such proof is admissible it must be first shown that such person is in such proximity to the person slain that he could have committed the offense, and in this case the record is wholly lacking in any evidence that would place L. H. Brown in such position where it would have been possible for him to have committed the offense. These are the two main questions presented in appellant's brief, and we have given to each of them most earnest consideration, arriving at the conclusion that the court did not err in the premises. While this is a case of circumstantial evidence, the evidence offered in behalf of the State amply supports the conclusion arrived at by the jury. While appellant in his statement that night and in his testimony on the trial said a man came upon the gallery and inflicted the injuries, took his pants and went in a certain direction, the officers testified they, too, went in that direction, found appellant's pants, and further on found his knife. Between the point where the pants were found and the knife was found they discovered certain tracks; these tracks were measured, and instead of these tracks leaving the premises, they found where tracks of the same size, character and kind led back towards the house, indicating that the person who made them had returned to the house. Appellant said his wife was struck only one or two blows; the bruises on her arm, apparently while she was trying to ward off the blows that were rained on her head and on her breast and body, demonstrated that some seven or eight or more blows had been struck; the wound on the right side of the forehead measured some five inches, the brains and pieces of the fractured skull being found in various places, some of it having been swept on the ground; blood was spattered over the wall, and even on the ceiling of the gallery; it was demonstrated that a man could not stand on the side of the bed, where appellant stated the unknown man stood, and strike the blows, because the indentures in the wall, even if one could reach it with the iron bar, could not have been made from

the side of the bed, but the one who struck the blows that made these indentures must have been at the head of the bed. But one of the most significant circumstances in the case, while appellant seeks to explain the blood on his clothing, is the fact that splotches of blood were found on the back of his undershirt. We do not understand how these splotches of blood in the back could have been made by one handling the body, but a reasonable conclusion would be that when raising the iron wedge above the head to strike another blow the blood dripped on the back. At least such is a reasonable deduction, and under such circumstances the judgment is affirmed.

*Affirmed.*

Davidson, Presiding Judge, dissents—may write later.

### ORDER OVERRULING MOTION FOR REHEARING SET ASIDE.

PRENDERGAST, PRESIDING JUDGE.—On this the 27th day of June, 1913, came on to be heard the application of appellant to have this court recall its judgment and order overruling motion for rehearing rendered herein on the 25th day of June, 1913, and that they be permitted to file additional briefs and make an oral argument in this cause on rehearing, and it is considered by the court that said prayer should be granted in part and overruled in part.

It is ordered by the court that judgment and decree heretofore rendered on the 25th day of June, 1913, overruling the motion for rehearing be recalled, annulled and vacated, and this cause continued until the next term of court, beginning on the first Monday in October. It is further ordered that appellant be permitted to file additional briefs herein on or before September ·1, 1913, but the request that they be permitted to argue said motion orally be and the same is hereby denied.

In this order Davidson, Judge, and Prendergast, Presiding Judge, concur, and Harper, Judge, dissents.

### ON REHEARING.

#### June 3, 1914.

HARPER, JUDGE.—This motion for rehearing has been pending for some time, and attorneys for appellant have filed a very able and exhaustive brief, citing many authorities, principally upon whether or not the statements of appellant and his wife made to Mr. and Mrs. Drinkard and Berney Brown that appellant had a few days prior to the conversation rescued her from a creek when she was about to drown, were admissible. Appellant was permitted to testify to the fact he and deceased had gone in bathing, and after he had gone out of the water and was putting on his clothing, Mrs. Brown got into deep water, and was about to drown, when he rushed into the water and saved her. The State offered no proof to contradict this testimony, and all persons who knew anything about the facts were permitted to so testify. But when

the .defendant offered to prove, first, what he had told Mr. and Mrs. Drinkard about it several days after the occurrence, the court excluded the testimony. And when he offered to prove by Mr. and Mrs. Drinkard and Berney Brown what the deceased had told them about it, the testimony was excluded. These statements as shown by the bills were but a narration of a past event. Appellant insists that the fact that they had narrated the circumstances to Mr. and Mrs. Drinkard and Berney Brown was admissible as showing his state of mind,—that he did not desire the death of his wife. Certainly the fact that he had saved his wife from drowning was admissible upon that issue, but all legal testimony tending to prove that fact was admitted. Appellant pays high tribute to Mr. Wigmore and his excellent work on Evidence, but none of the quotations from that excellent work we think bear out his contention in this case, that recitations of past events are admissible. On the other hand, Mr. Wigmore, in section 1788, volume 5, says: "The true nature of the hearsay rule is nowhere better illustrated and emphasized than in those cases without the scope of its prohibition. The essence of the hearsay rule is the distinction *between the* testimonial (or assertive) use of human utterances, and their non-testimonial use. The theory of the hearsay rule is that, when *human utterance is offered as to the truth of the fact asserted in it,* the credit of the assertion becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand and subject to the test of cross-examination. If, therefore, an extra judicial utterance is offered, not as *an assertion to evidence the matter asserted,* but without reference to the truth of the matter asserted, the hearsay rule does not apply." In this section he cites many illustrations. In this case would the *statement* made by either Mr. and Mrs. Brown to the witnesses named, that Mr. Brown had rescued her from drowning, have any weight in showing his state of mind or that he loved his wife and did not desire her death? No, but evidence of the fact that he had saved her from drowning would be of strong probative force to prove that fact, and this evidence was admitted—the only evidence which would have a bearing on those issues. The only service to admit what she or he said about it would be to prove that he had done so, and all the authorities hold that a recitation of a past event is not admissible to prove that the fact was true.

Mr. Wharton in his work on Criminal Evidence (10th ed.), says: "The rule does not permit the introduction of a narrative of past events made after the events are closed by either the party injured or bystanders," citing Com. v. Cooper, 81 Am. Dec., 762; Com. v. James, 99 Mass., 438; Greenfield v. People, 85 N. Y., 75; Hays v. State, 40 Md., 633; Gardner v. People, 4 Ill., 83; Cross v. People, 95 Am. Dec., 474; Burns v. State, 57 Ind., 46; Tipper v. Com., 1 Met. (Ky.), 6; Riggs v. State, 6 Caldw., 517; Hall v. State, 48 Ga., 608; Chaney v. State, 31 Ala., 342; Scaggs v. State, 8 Smedes & M., 722; State v. Brown, 64 Mo., 367; State v. Pomeroy, 25 Kan., 349; People v. Samuels, 19 Cal., 275, and other cases.

All authorities cited by appellant in his able and exhaustive brief go

only to the issue that when the evidence goes to show the state of mind of the person on trial, and that is an issue in the case, then statements and acts which go to show mental status are admissible. This we have come to the conclusion is a correct rule of law, and do not now wish to be understood as questioning it, but the above testimony could and would have no bearing on his state of mind, but was offered and intended for another purpose—to prove that in fact he had saved his wife from drowning, and the testimony was inadmissible to prove that fact. It would but corroborate his testimony on the trial of the case, and he can not be supported by what in law are purely hearsay statements when it has not been sought to impeach by contradictory statements or otherwise.

The next contention is that this court erred in holding that the trial court did not err in excluding the testimony of Mrs. Thomas, as to what Mrs. Brown told her while living in Brownwood: "She asked me had I heard that she and Mr. Brown were separated, and I told her yes; she says, 'It is false,' she says, 'I have left the farm and moved to town, his children and mine can't get along,' and she says, 'I hate the farm,' and she says, 'He wants my children to work in the field and they shouldn't do it,' but says, 'We are not separated, he supports me, and he comes to see me,' and she says, 'I love Mr. Brown and he loves me,' says, 'He was to see me yesterday and bought the groceries and everything'; she says, 'I don't know whether I will ever go back to the farm or not,' but she says, 'I will never leave Mr. Brown,' and she says, 'He has a son I don't love, he has gibed me about the property so, he told me nearly every day that I married his father for property and I would only get one-twelfth and it wouldn't be very much to fuss over.'" This was offered to show the relationship existing between appellant and his wife, as bearing on whether or not he desired her death. In this connection, the evidence heard on this trial must be considered. The State did not contend, nor did it offer any evidence to show that the separation was a permanent separation. Mr. Brown testified fully in regard to all these matters. Mrs. Brown's daughter by her first husband testified that appellant gave her mother money and came to see her two or three times a week while she was living in Brownwood. And it was further shown by all the testimony, both for the State and defendant, that in March prior to the homicide in September, that Mrs. Brown had moved back to the farm. In law this was a condonation of each of the things that had taken place prior to that time. If the State had sought to prove a permanent separation, or that he did not visit his wife while she lived in Brownwood, or that she did not visit the farm, then the question as to whether this testimony ought not to have been admitted would be more serious, but as the state of mind of Mrs. Brown was not an issue in the case, and this testimony would only show her view of the matter, it could but indirectly at most tend to show appellant's state of mind. But as herein said, by all the witnesses for the State as well as the witnesses for the defendant, it was proven that he visited her two or three times a week while she remained in Brownwood; that she visited

the farm; that he contributed to her support, and that some six months prior to the homicide she returned to the farm, and she and appellant lived together as husband and wife, consequently the statements about the separation not being permanent would have been on an issue not really in the case, for the testimony and all the testimony showed that this separation which occurred a year prior to the homicide was not a permanent separation, and if the court had been in error in excluding that portion of the statement, it would be a harmless and immaterial error. As to the other portion of the statement of Mrs. Brown, which this witness would have testified, that "she loved Mr. Brown and he loved her," made as hereinbefore stated more than six months before the homicide, would at most only indirectly tend to show the state of feelings of Mr. Brown at that time, and have slight or no tendency to show what was the state of his mind six months thereafter, for by the record in this case, the principal trouble arose between them after she had returned from Brownwood to the farm, and it was at the time of this trouble after she had returned to the farm that appellant told Clinton Brown "that he (appellant) had not induced his wife to return to the farm; that it was her who wanted to come back, and that he thought she had talked to a lawyer or someone who made her wise, and she was working so as to get some of his property in some way, and she was going to try to make it so hard for him and his family that he couldn't put up with her, and he would have to *run her off*, and she hoped thereby to get some of his property." In all but one instance it will be noticed that the remarks showing love, affection, etc., were statements of Mrs. Brown and not statements of appellant. By this testimony appellant was endeavoring to show his state of feeling by making proof of how she felt and what she said, not what he had said as showing a kindly state of feelings on his part. Every time he is shown by the record to have opened his mouth in regard to the matter, his remarks would not tend to show that he loved his wife or had affection for her except in one instance: he offered to prove that while talking to Mrs. Drake he had said that "he would not let his wife drive a certain horse, because it would kill her, and that his wife had got hot about it." This would have a tendency to show that he did not then desire the death of his wife, and perhaps ought to have been admitted as having a slight tendency to show his state of mind. In all cases where the State offers testimony to show quarrels, ill will, and a state of bad feelings existing on the part of the person on trial towards the party killed, as evidencing a motive for the homicide, evidence that tends to show a different state of feeling—that he was kind in his attentions to his wife; that their relations were pleasant and agreeable, ought to be admitted, and in this case all such testimony was admitted, except in the one instance where Mrs. Drake would have testified that he said the reason he would not let deceased drive a certain horse, he was afraid it would kill her. However, Mrs. Drake was permitted to testify: "During the time that I knew Mr. and Mrs. Brown I had occasion to associate with them when they were both together; they would come to my

house together sometimes; I knew them from the time they moved there, and I think I was the first lady that went to see them after they moved there. Mrs Brown came to my house and to Mrs. Beeman's more than she did anywhere else, as we were closer, and she came to my house right smart, and several days I have stayed with her all the evening; they seemed to get along together as nice as any man and woman I was ever about. I never heard him give her a cross word or her give him a cross word; their relations were pleasant, and they seemed to get along as nice as any people I was ever about." Mr. and Mrs. Drinkard were also permitted to testify that they frequented the home of appellant and his wife and their relations were pleasant and agreeable, as were a number of other witnesses.

We have carefully reviewed each and all the authorities cited by counsel for appellant in their able and exhaustive brief, and reread this entire record, and we are of the opinion that no reversible error is presented. The main cases relied upon by appellant seem to be the cases of Leabo v. State, 84 Mo., 168, and Pettit v. State, 135 Ind., 349. The case of Leabo v. State is a case where the defendant was being prosecuted charged with killing his wife, and in stating the case the court says: "There was evidence tending to prove that the relations between the defendant and his wife were not as pleasant as should exist between husband and wife. *This consisted exclusively of her expressions and conduct.* If there was a particle of evidence, except that found in the conduct and expressions of deceased, tending to prove that defendant was ever unkind to her it has escaped our attention." We have no such state of facts in this case. The State was only endeavoring to show his state of feeling by *his acts and conduct,* and not the conduct of his wife, the deceased. But what was the holding in the Leabo case? In that case it is stated that there was evidence that Mrs. Leabo was insane at times, and it was the contention evidently of appellant that she was temporarily insane when she was guilty of the acts and conduct relied upon by the State; and further to show that when she was not in that mental condition, her acts and conduct were such that would show that their relations were entirely pleasant and friendly. Under that state of facts we are inclined to agree with the court in the Leabo case. However, the Missouri Supreme Court overruled that case specifically in the case of Punshon v. State, 27 S. W. Rep. (Mo.), 1111. In the Punshon case the authorities are reviewed, and it is stated by the court that the Leabo case is not supported by any authority. However, it has been quoted from in other jurisdictions in cases where it was claimed that the person alleged to have been killed had committed suicide, or insanity was an issue. And here we might state that in a case where the contention is that the dead person committed suicide, her acts and conduct which would have a tendency to show that she committed the act, should be admitted; or in any case where the state of the *dead person's feelings* are an issue in the case, then her acts, conduct and declarations are admissible, and this is all any of the authorities cited by appellant in his able brief, hold when read and analyzed, unless it

be the case of Pettit v. State, supra, decided by the Supreme Court of Indiana, and in that case it is not held that declarations made by the wife to third persons are admissible, but only that her letters to her husband are admissible, and that her declarations in the letters showing a friendly state of feeling on her part, would be some evidence as showing his state of feelings, but in no other authority cited by appellant, and in none we have been able to find is that case followed in so declaring, and we do not believe it to be a sound proposition of law. It is true the Pettit case, supra, has been cited in other cases, but only on entirely different propositions. One of them being that a husband who is charged with killing his wife by poisoning should be permitted to introduce evidence tending to show that she had been sick suffering from malaria, and that she died from malarial poisoning, and this is the rule in this State—when there is evidence tending to show that another did the killing, and such person is placed in such proximity as to have been able to commit the deed, or that the person was accidentally killed, or died from natural causes, such testimony should be admitted. The most exhaustive review of this question in any of the cases cited by appellant, or which we have read, is contained in the opinion in the case of Trefethen v. State, 24 L. R. A., 235, but it is too lengthy to herein quote from. However, we will state we agree to the rules of law therein announced, but under the facts in this case it has no application to any of the testimony rejected, unless it be the testimony of Mrs. Drake, and as herein stated if such testimony should be held to be admissible, it would not be such error as should cause the reversal of the case in view of her other testimony which was admitted. We have had no case to which we have devoted more thought and study than to the motion for rehearing in this case; the argument filed is able and exhaustive and cites many authorities, but it is deficient in that it does not take the law as announced in those cases and seek to apply the rules therein announced to the evidence in a case like this. The defense did not rely on the acts and conduct of Mrs. Brown as furnishing any excuse of appellant's acts if he killed her; their defense was that a third person slipped up on the gallery and killed her while she slept, and all the evidence shows that her life was taken in a most brutal manner while she was asleep. Under no phase of the case was the state of Mrs. Brown's mind an issue in the case. The circumstances in the case, to our minds, fully sustain the verdict of the jury, and the motion for rehearing is overruled.

*Overruled.*

September 8, 1914.

DAVIDSON, JUDGE (dissenting).—I have been wholly unable to agree to the affirmance of this case. The record is voluminous and contains many bills of exception showing palpable error of most material nature. These questions are so ably, fully and conclusively pointed out and discussed by counsel for the appellant in the argument hereto attached that I have deemed it but proper to adopt same as my dissent-

ing opinion. Were I to write fully I would or could but follow in my own language the reasoning of distinguished counsel writing the argument. I therefore deem it but proper to give them credit, which I do by adopting their argument as my dissent. I also believe their exhaustive treatment of the questions discussed should be perpetuated in our jurisprudence as a contribution to it:

"It is an elementary principle, sound in reason, well established and recognized by legal precedent, that the existence of any emotion or state of feeling, such as hatred, malice, affection, fear, or the like, may be proven by the conduct or the utterances of a party, indirectly indicating the feelings that inspire them. In fact, it is established that the best evidence of the condition of a person's mind is his acts and words. accompanying any given feeling. Therefore, utterances offered to illustrate or establish a state of mind or state of feeling are admitted as original evidence. To support this, it is hardly necessary to refer to the decided cases, but will be sufficient to refer to some of the elementary authorities. Wigmore on Evidence, secs. 1730, 1732 and 1790; Jones on Evidence, 2nd ed., vol. 2, sec. 350; American & English Encyclopedia of Law, vol. 15, p. 314. Consequently if, in a case like the one at bar, it becomes material to determine the state of feeling of a defendant toward the deceased at any given time, and when such state of feeling has become an issue, the declarations of the defendant, made at the time the state of feeling is asserted to exist, are admissible on the issue; in fact, they constitute original and the best evidence of his feelings and in such a case it is immaterial that such declarations may be favorable to his side of the issue. The objection that they are self-serving is not tenable. Wigmore on Evidence, sections 1723, 1790; Butler v. State, 33 Texas Crim. Rep., 232; Nelson v. State, 58 S. W. Rep., 107; Everett v. State, 30 Texas Crim. App., 682; Wharton's Criminal Evidence, sec. 693; Greenleaf's Evidence, sec. 102.

"In Mutual Life Insurance Co. v. Hillman, 145 U. S., 285, it is said: 'When it is material to prove the feelings of an individual toward another at a certain time, it is proper to receive in evidence the expressions used by the individual, so far as the same are indicative of such feelings.'

"In section 1790 of his work on Evidence, Mr. Wigmore says: 'The condition of a speaker's mind as to knowledge, belief, rationality, emotion or the like may be evidenced by his utterances, either used testimonially as assertions to be believed or used circumstantially as affording indirect inferences.'

"Again, in section 1730, the learned author says: 'The existence of an emotion, hatred, malice, affection, fear and the like is usually evidenced by conduct or by utterances indirectly indicating the feelings that inspire them.'

"We have referred to these general authorities announcing this well settled principle for the reason that, in the discussion of the various bills of exception, it is a matter of importance to hold this principle in mind. 'A frequent recurrence to first principles is absolutely necessary

in order to keep precedents within the reason of the law,' was written by Judge Roberts in Duncan v. Magette, 25 Texas, 245, at page 252.

"In the beginning it may be said in a general way that, in this case, the State relied for conviction upon circumstantial evidence. As a part of its case, it sought to show that appellant had a motive to kill his wife. This motive the State sought to show was illustrated and established by certain ill feelings and bad relations that had been existing between the defendant and the deceased after their marriage. Among other circumstances introduced as showing such bad relations and ill feeling, the State proved that defendant and deceased had separated and that she had gone to Brownwood and defendant had remained on his farm. The State also proved by the witness Viola Wilson, and other witnesses, facts tending to show an actual separation and that defendant did not support the deceased during said time and that deceased supported herself and her children during the separation by sewing and by selling toilet articles. Other bad relations and ill feelings were also illustrated by various quarrels proved by the State. It is unnecessary to go into detail with reference to these various quarrels over their children and other matters, but the facts introduced by the State along this line were sufficient to show that the parties were getting along badly. In this state of the record, and upon this issue, the defendant sought to introduce the testimony shown in the various bills of exceptions disclosed in the majority opinion, and to which we will now refer.

"Bill of exception No. 16 complains of the refusal of the trial court to admit the testimony of the witness Minnie Thomas with reference to certain statements made to her by the deceased, Sallie Brown, while said Sallie Brown was living in the city of Brownwood, apart from her husband. The bill shows that the court refused to admit the following testimony of the witness:

" 'She (the deceased) asked me if I had heard that she and Mr. Brown (appellant) were separated, and I told her, yes. She said, "It is false. I left the farm and moved to town. His children and mine can't get along. I hate the farm. He wants my children to work in the field and they should not do it. We are not separated. He supports me and he comes to see me. I love Mr. Brown and he loves me. He was to see me yesterday and bought the groceries and everything: I don't know whether I will ever go back to the farm or not, but I will never leave Mr. Brown. He has a son I don't love. He has gibed me about the property, too. He told me nearly every day that I married his father for the property and I would only get one-twelfth and it would not be very much to fuss over." I wanted you to know that we were not separated.'

"The objection of the State that this testimony was hearsay was sustained by the court. We submit that the testimony was clearly admissible for the following reasons:

"(1) Since the State contended and sought to show by its witnesses as proof of motive that the defendant and deceased had been getting along badly and had in fact separated and that he had no affection for her,

and since the state of his feelings with reference to his wife thus became a material issue in the case, her declarations evidencing the state of her affection for him and also evidencing their friendly relations generally were admissible not only as establishing the state of her own mind and affection, but as indirectly evidencing the state of defendant's feelings. The State contended, in substance, that defendant and deceased were unfriendly each toward the other, were getting along badly as husband and wife, and had in fact gone so far as to separate as the result of their unfriendly state of mind. In this state of the record, the declarations of either of them being admissible to establish the state of mind of the declarant, were also admissible to indirectly establish the state of mind of the other party. On account of the close and peculiar relation between husband and wife, the jury might well have concluded that the state of the wife's affection with reference to the husband would ordinarily furnish a true and reliable index to the state of his affections toward her, for if he had been mistreating and abusing her, or evidencing toward her a lack of affection, ordinarily this fact would be reflected in the state of her own affections toward him. In other words, the relations between a husband and wife are so reciprocal and mutual in their nature that the declarations of one with reference to the affection of one for the other must indirectly indicate, in most instances at least, the state of affections of the other. The weight or value of the evidence was for the jury. These propositions are clearly and squarely supported and applied by the authorities following: Wigmore on Evidence, sec. 1730, and cases cited; Pettit v. State, 135 Ind., 395, 34 N. E. Rep., 1118; Leabo v. State, 84 Mo., 168, followed by this court in Early v. State, 51 Texas Crim. Rep., 382; Josephine v. State, 39 Miss., 613; Cole v. State, 45 Texas Crim. Rep., 225; s. c., 48 Texas Crim. Rep., 439. See also Wharton's Criminal Evidence, section 304, page 1696, and also section 948, page 1828, second edition, where the doctrine announced in the Pettit case, supra, is embodied by the author in the text of his work.

"In the case of Pettit v. State, supra, it was held that, on the prosecution of a husband for the murder of his wife, the State relying on loss of affection for her and infatuation for another woman, an affectionate letter written by the wife to the husband is admissible to disprove the existence of a motive for killing his wife. We quote (pages 1124-25):

" 'Another question arising upon the record is as to the alleged error of the court in rejecting, as evidence for the defendant, a letter from Mrs. Pettit to her husband, containing expressions of endearment. It is urged by appellant's counsel that the letter was admissible, both in rebuttal of the theory of the husband's loss of affection for his wife, and in contradiction of Hickman as to complaints of the wife heretofore given, and of Wilson that Pettit was neglecting his wife, in being from home days at a time without advising her of his whereabouts. The record does not disclose that the court permitted evidence of complaints by Mrs. Pettit. On the contrary, such evidence was expressly

excluded. The evidence of Hickman and Wilson was of conversations between Pettit and themselves. The letter, therefore, was not admissible in contradiction of those witnesses; but, from our view of the question, it was proper to have admitted in evidence the letter of the wife to the husband. The relations existing between the deceased and her husband were naturally, and, by the theory of the State's evidence, necessarily, the foundation upon which the guilt of the defendant was to be determined. While indifference or even ill treatment by the husband does not necessarily destroy all the affection of the wife for him, yet the degree of that affection must, to a greater or less extent, depend upon his treatment of her. The relation of husband and wife is peculiar, in that all of the interests of life concern them alike, and are so inseparable from their thoughts of and affections for each other that it can not be said, as a matter of law, that the estrangement of the husband necessarily destroys the affection of the wife for him. It necessarily follows that the existence of affection for him does not of itself preclude the loss of affection by him. Where the relation is the subject of inquiry, and where it becomes proper to investigate the treatment of one towards the other, with a view of determining that relation, it is proper to canvass the treatment of the other toward that one. The treatment by each of the other casts a light into the otherwise dark recesses of the heart of each. The strength of that light is a subject for the jury, and may not be determined as a question of law. The letter of a wife, with whose murder her husband was charged, though written to a third person, was held admissible 'to disprove the existence of the motive to commit murder, which the testimony for the State conduced to establish.' State v. Leabo, 84 Mo., 168.

"This case is squarely in point. It is based upon sound reason, has been cited by the elementary writers with approval, and has never been disapproved.

"The case of State v. Leabo, 84 Mo., 168, 54 American Reports, 91, is also in point. In that case it was held that, on a trial of a man for murder of his wife, the prosecution having given proof of the conduct and expressions of the wife to show that their relations were unpleasant, the defendant may rebut it by letters of the wife to a third person, written from three to five months before her death and indicating affection for her husband. In that case, the court says:

" 'We do not decide that such testimony is admissible under all circumstances, but when the plaintiff makes it a part of his case to show the existence of bad blood between the husband and wife in order to establish a motive for guilty conduct ascribed to him, it is admissible. If the State may introduce evidence of her declarations and conduct inculpatory of her husband, it is equally his right to have the benefit of her declarations and conduct to meet such evidence, and what better evidence could there be of a husband's affection for his wife than her confidential letters to a friend and companion of her youth in which she declares that he is the kindest husband in the world, worth his weight in gold, and expressing a wish that, if that friend should ever

marry, she may get such a man as she has. The evidence offered by Leabo was no more hearsay than that received in the case above cited. Will such evidence be admitted in a civil action in resistance of a mature demand, and refused in a criminal prosecution, in which one's life or liberty is at stake? Has the law less regard for the life and liberty of a citizen than for his goods and chattels?'

"But it is said in the majority opinion that the case of State v. Leabo was overruled by the Supreme Court of Missouri in the case of State v. Punshon, 124 Mo., 448, 27 S. W. Rep., 1111, in which it was held, on trial of a husband for murder of his wife, her statements tending to show the affectionate character of their domestic relations are not admissible. We do not believe that this furnishes a sufficient reason for a refusal to follow the Leabo case. It is true, of course, that, where a decision has been overruled by the court which rendered it, it can no longer be cited as a precedent in that court or in any subordinate courts of the same State. It may, however, be still followed in other jurisdictions if regarded as announcing a sound doctrine. We submit that the case of State v. Leabo not only announces a sound rule, but a rule that has been universally accepted, and further that the case of State v. Punshon has never been approved except by the Supreme Court of Missouri, and has been condemned by the leading text writers as announcing an unsafe and unsound rule. Mr. Wigmore, in section 1730 of his work on Evidence, in a lengthy note, collates many of the leading cases on this subject, citing, among others, State v. Leabo, supra. He also there makes the following mention of State v. Punshon:

"*'In State v. Punshon, 124 Mo., 448, 27 S. W. Rep., 1111 (1894), such evidence was, against all precedent, rejected.'*

"If this criticism is a correct one, and we submit that it is, the case should not be followed.

"Mr. Chamberlayne, in his work on Evidence, in a·note following section 2671, with reference to the admissibility of such declarations, and after citing the case of State v. Leabo with approval, says:

"'These declarations have been rejected as hearsay apparently under a misapprehension. State v. Punshon, 124 Mo., 448, 27 S. W. Rep., 1111.'

"Mr. Wharton, in the latest edition of his work on Criminal Evidence, volume 2, page 1828, says:

"Where accused is on trial for uxoricide and there is evidence that the relations between him and his wife were unfriendly, it is relevant for him to introduce letters *from her* showing her *affection* for him,' citing Pettit v. State, supra, and State v. Leabo, supra.

"The author does not note the case of State v. Punshon, supra, at all. And again, the same writer, in section 904, on page 1696, embodies in his text the doctrine, of the Pettit case. The doctrine of the case of State v. Leabo is cited in Cyc. as a correct rule, volume 21, page 914. *And again, the case of State v. Leabo has also been followed in our own State, and that since it was overruled by the Supreme Court of Missouri.*

We refer to the case of Early v. State, 51 Texas Crim. Rep., 382, and from the opinion in that case quote the following:

" 'In the original opinion we failed to treat one of appellant's assignments predicated on his twenty-sixth bill of exceptions, relating to the excluded testimony of Cleve Sanders. Appellant sought to prove by this witness that after the difficulty in the barber shop between Calloway and Early that they made friends. It appears that the State in order to show animus on the part of appellant towards deceased proved a difficulty between Early and deceased about two or three weeks before the homicide in the barber shop at Mt. Calm and this was followed by proof on the part of the State by the witness Stirman; that on the day preceding the homicide appellant had used language manifesting ill will towards deceased on account of the previous difficulty at the barber shop, and in addition to this testimony indicating ill will, the State also proved by Guion that appellant had said Calloway was a rascal and he could not arrest him. In the face of this testimony on the part of the State, appellant himself testified that he and deceased had made friends with regard to the difficulty at the barber shop subsequent thereto. In addition to this he offered to show by the witness Sanders that he knew the defendant and deceased were friendly after the difficulty at the barber shop, because he had been informed by the deceased and the defendant that they had made up, and had agreed to forget and overlook said trouble, and that deceased and defendant informed said witness after the difficulty their feelings were friendly towards each other. We believe this testimony was admissible. The State's case against appellant was purely of a circumstantial character. The State proved appellant was present when Harmie Horn slew deceased, but was not able to prove any direct act on the part of appellant showing any actual participation in the difficulty. The case against appellant was mainly supported by proof of his animus growing out of a former difficulty between himself and deceased at the barber shop, and any proof, it occurs to us, was admissible which would show that the former difficulty had been settled and the parties were friendly, and here appellant proposed to show it both by expressions from appellant and from the deceased to the witness Sanders. This could hardly be said to be purely self-serving declarations; certainly not coming from deceased, and we hold this testimony was authorized. See Gaines v. State, 38 Texas Crim. Rep., 202; Turner v. State, 46 S. W. Rep., 830, and State v. Leabo, 84 Mo., 168.'

"Since the case of State v. Punshon has not been approved by any court except that of Missouri, and since it is condemned by two of the leading writers on evidence and ignored by the others, and since the case of State v. Leabo is cited with approval in nearly all the elementary works on evidence and *has been expressly followed by this court,* we do not believe that this court should follow the case of State v. Punshon. It undoubtedly announces, as has been shown, an unsound rule and one contrary to all other precedents. We have noted that in the opinion of the majority reference is made to the fact that, in the case of State

v. Leabo, the deceased, Mrs. Leabo, 'was periodically slightly deranged before and after her marriage and, when so affected, expressed herself as weary of life.' It does not appear from the opinion of the court in that case that it regarded this fact as of any controlling importance. The declarations were held admissible 'to disprove the existence of the motive to commit the murder, which the testimony of the State conduced to establish.' Moreover, if that be regarded as a controlling feature in the case, we do not understand how it can affect the admissibility of the declarations generally, for their admissibility must depend upon their being in rebuttal of the contention of the State. In the Leabo case, the wife had made declarations indicative of a bad state of feeling between herself and husband and thus indirectly indicating his lack of affection for her. If the husband was entitled in that case to introduce her declarations made to other parties at different times to rebut what was asserted in the other declarations, then in this case defendant was entitled to use similar testimony. The fact that mental derangement and insanity is involved had no material bearing on the question. Moreover, such an issue was not presented in the case of State v. Pettit, supra, and that case has been universally approved and nowhere disapproved. And again, the Leabo case having been approved in our own State, and the rule in that case having been adopted in this State, we think it is too late to refuse to follow that case, unless the court is prepared to overrule the case of Early v. State, 51 Texas Crim. Rep., 382, and no good reason for overruling that authority is suggested. *In that case, no issue of insanity or mental derangement or any other fact of that character was involved.* The point was squarely ruled that, since the State has introduced various facts and declarations tending to show a bad state of feeling between defendant and deceased, defendant was entitled to introduce the declarations of the deceased to the witness Cleve Sanders in rebuttal that he and defendant had made up and were friends. Under the Early case, the testimony in this case was clearly admissible. If precedent can be invoked to settle any legal question, then this question is settled by the Early case. There are, moreover, other decisions of this court which support our view. See Cole v. State, 45 Texas Crim. Rep., 225; Cole v. State, 48 Texas Crim. Rep., 439; Schaur v. State, 60 S. W. Rep., 249; Nelson v. State, 58 S. W. Rep., 107; Everett v. State, 30 Texas Crim. App., 682; and Butler v. State, 33 Texas Crim. Rep., 232. See also the case of Morrison v. State, 40 Texas Crim. Rep., 473, at page 497, where declarations of this character were admitted on behalf of the State over the objection of the defendant and a sentence of death was affirmed, the court ruling the declarations admissible as indicative of mental condition or emotion. See also State v. Baldwin, 36 Kan., 1; Commonwealth v. Howard, 91 N. E. Rep., 397; Gaines v. Relf, 12 Howard, 472. In the case last cited it was held that where it was material to show the state of mind of a husband toward his wife, his letters to a third person indicative of affection for her were admissible. Many other authorities might be cited, but we deem it unnecessary. No pointed authorities are cited to the

contrary, except the case of State v. Punshon, supra, and we do not believe that case announces a sound doctrine, as we have shown.

"(2)   The evidence of the witness Minnie Thomas with reference to her conversation with the deceased, heretofore referred to, was admissible upon another and distinct ground from the one last discussed, viz: One of the facts introduced by the State as illustrating and establishing the bad relations existing between defendant and deceased was the established fact that they had separated as the result of their disagreements. In other words, the State contended that, when Mrs. Brown was staying in Brownwood and defendant was on his farm, they were separated in the ordinary sense of that term. From this the jury might and probably would infer that they were lacking in affection for each other. It, therefore, became material and relevant for defendant to introduce any competent evidence establishing the true character of this supposed separation. A separation between a husband and wife is an abnormal state, continuous in character, and, on sound principle as well as authority, the declarations of either of the two parties during the existence of said abnormal state characterizing the said state, are admissible as original testimony in the nature of res gestae declarations accompanying the continuous act and state of separation. It has always been held that the wife's declarations upon leaving him and separating herself from her husband are admissible as res gestae accompanying the act of separation. McGowen v. McGowen, 52 Texas, 657. The State of separation being continuous in character, under the same rule the declarations of either party during the existence of said continuous state or act should be admitted as res gestae of said act or state and as characterizing same. See Edgell v. Francis (Mich.), 33 N. W. Rep., 501. See also Jones on Evidence, second edition, section 347, discussing the time through which declarations may be regarded as res gestae declarations and calling attention to the riot cases and other cases of like character, involving continuous transactions.

"We submit, therefore, that, since the State contended in this case that the separation between husband and wife was unfriendly, the declarations of either during the existence of such state of separation characterizing this state were admissible upon the principles just discussed.

"Many authorities might be referred to to establish the correctness of our views last expressed. We will refer, however, to only a few of them.

"In Postens v. Postens, 3 Watts & S. (Pa.), 127, it was held that, where the relations existing between two parties is in issue and the question as to whether it is that of landlord and tenant or master and servant the declarations of either relating to the matter and made during the time in question are competent evidence as a part of the res gestae. We quote, 'The relations of the parties being of a doubtful interpretation, the character in which they really stood may be proved by the declarations of either made at the time as to the relations existing between them.' Applying this rule it is undoubtedly true that the declara-

tions of either Mr. or Mrs. Brown during the time of their separation characterizing the state of their relations was admissible. There can not be the slightest doubt with reference to this proposition.

"Again it was held in Jewell's Lessee v. Jewell, 1 Howard (U. S.), 219, 232, that, where the issue was whether a man and woman who had cohabited for several years and had several children and then separated by agreement, were legally married and their acts and declarations during the time of cohabitation had been shown, a notice appearing in a newspaper a short while after the separation signed with the name of the husband warning all persons against giving credit to the woman on his account was held admissible as a part of the res gestae of the act of separation and previous cohabitation.

"In Badger v. Badger, 88 N. Y., 546, it was held that, where the question in issue was whether a lawful marriage existed between two persons who lived as husband and wife a letter in the alleged husband's handwriting and signed by the woman alone as his wife was admissible as a part of the res gestae.

"In Burns v. Smith, 21 Montana, 251, in an action for the specific performance of a contract alleged to have been made by defendants' intestate, to give a child's share of his estate to one he received into his family and treated as an adopted child, the declarations of the deceased as to the relations between himself and such person were held admissible as a part of the res gestae, on the ground that the res gestae extended over the entire period of years between the time of the alleged contract and the death of the deceased.

"We therefore submit that the declarations of Mrs. Brown made during the period of the separation between herself and husband were admissible as res gestae of the act or state of separation and as characterizing the same. This question is not discussed in the opinion of the court, but nevertheless we feel certain that under sound principle as well as precedent her declarations should have been admitted upon this ground.

"(3) And again, upon another ground that may be regarded as distinct, the testimony referred to of the witness Minnie Thomas should have been admitted. The State did not content itself with merely proving the unfriendly state of defendant's mind toward the deceased. Its testimony also tended to show that both parties were in an unfriendly state of mind each with reference to the other. In other words, the State sought to show and its testimony tended to show a mutual state of unfriendliness and lack of affection. For instance, this was shown by proof that they had quarreled, had lived apart and had separated as the result of disagreements, etc. It was, therefore, we submit, permissible for defendant to introduce the testimony referred to of the witness Minnie Thomas to prove the state of mind of the deceased in rebuttal of the contention of the State and as destructive of the weight to be attached to the theory of the State by the jury. Clearly, if this evidence had been admitted and, based on it, the jury had believed that, during this separation, the deceased loved defendant and was being sup-

ported by him, this would or at least might, have caused the jury to disbelieve the theory of the State that defendant, during the period of separation, was lacking in affection for his wife. The contention of the State that defendant did not love his wife was, under the record, closely coupled with its contention that she did not love him. Hence testimony tending to show her love for him inferentially tended to show his love for her. Leabo v. State, supra; Pettit v. State, supra, and other authorities referred to under the first proposition.

"(4) There is another ground upon which the testimony of the witness Minnie Thomas was admissible, in this: The State had been allowed to prove not only the declarations and conduct of defendant illustrating or evidencing his lack of affection for his wife, but also, in this connection, had introduced her own declarations and conduct illustrating and evidencing her lack of affection for him. For instance, her declarations made in his presence evidencing their disagreements and bad state of relation generally had been admitted. Various conversations between them, as detailed by her in his presence to other witnesses, had been placed before the jury. This had been proven by the testimony of Clint Brown, Viola Wilson and various other witnesses. These declarations of the deceased, made in the presence of defendant, as testified to by various witnesses, evidenced not only a lack of affection for her by defendant, but also recited a course of bad treatment and disagreements on his part. Now, in this state of the record, the declarations of the deceased indicating that the defendant did not love her having been introduced on behalf of the State, her declarations made to other persons to a contrary state of facts were admissible. In other words, the state of the record is this: The wife, in the presence of the husband, and in the hearing of various witnesses, recites their previous quarrels and disagreements and his course of bad treatment toward her. The court admitted these declarations made by her, because they were made in his presence. Defendant then seeks to show by the witness Minnie Thomas that the deceased had made declarations to her contradictory of the state of facts introduced by the State. It is therefore clear upon elementary principles that the testimony of Minnie Thomas that the deceased had made declarations to her contradictory of the state of facts introduced by the State should have been admitted on this theory. The deceased stated to Minnie Thomas that she and her husband got along well, the only trouble between them being with reference to their children, and that defendant supported her and took care of her and came to see her, and that she loved him and he loved her. This declaration contradicted materially the declarations of deceased made to other witnesses, introduced by the State. They were, therefore, admissible.

"There is another matter with reference to the exclusion of certain testimony that we submit clearly presents reversible error, and we will briefly discuss it. Defendant's bill of exception No. 22 complains of the exclusion of the testimony of the witness Mrs. Sarah Drake. In that bill he sought to prove his own declarations made to Mrs. Drake on

Thursday before the tragedy on Saturday, said declarations evidencing an affection for his wife. It is unnecessary here to copy this bill of exception. It is referred to in the opinion of the majority of the court. It shows that Mrs. Drake and defendant had a conversation with reference to deceased driving a certain horse owned by defendant. It appears that Mrs. Drake's husband and defendant had been talking about trading horses, and in the conversation Mrs. Drake expressed the belief that a certain cream-colored horse owned by defendant was the prettiest horse he owned, but that, if she was the deceased, she would be afraid to drive it because it was so cranky. Defendant replied: 'There is no danger on earth in it, but that one out there she wants to drive it and I won't let her and she gets sort of hot about it sometimes, but she'll get over it and I know if I would let her drive it it would kill her.' The witness testified that the defendant stated that he would not let the deceased drive the horse on account of the fact that he was afraid that she would be injured and killed. This conversation occurred only two days before the homicide. Now, the State contended that the defendant had no affection for his wife, desired to get rid of her and that they had been getting along very badly. Various testimony was introduced by the State tending to support this theory. It was, therefore, material and relevant for the defendant to introduce any competent testimony disproving this contention. The best evidence of the state of mind or affection of any person at any given time, as we have shown, is his acts or declarations evidencing such state. This is held by all the authorities. In this connection, it is wholly immaterial that this declaration of defendant evidenced affection for his wife instead of a lack of affection for her. The objection that it is self-serving is not tenable and is not supported by any authority, but is contrary to all. All the authorities hold that, when declarations are offered upon the theory that they evidence a state of mind or affection, the objection that they are self-serving can not be sustained, because they are not regarded as ordinary declarations which may be classified as disserving or self-serving. They are admissible as original evidence of the state of mind of the declarant, and the mere fact that they are favorable to the declarant is wholly immaterial. For a court to hold that the defendant may not introduce his own declarations illustrative of a friendly state of mind towards the deceased is in practical effect to hold that he can not establish that fact by any means whatever. This follows for the simple reason that the best, the most logically persuasive and in fact the most reliable evidence of a state of mind is the act or declaration of the party at the time of the alleged state. See Wigmore on Evidence, section 1732; the same writer, section 1790. That the objection that these declarations are self-serving is not valid, see Wharton's work on Criminal Evidence, section 693, last edition; also Wigmore, section 1790.

"And again, in addition to the above view of this testimony of Mrs. Sarah Drake, we believe that it was admissible as circumstantially and

indirectly indicating the state of the defendant's mind and affections with reference to his wife. As we have said, this conversation occurred on Thursday. The deceased was killed on Saturday. There is not the slightest suggestion that this declaration of defendant was manufactured or prepared. The declaration does not involve or present a mere bare assertion of the fact of existing love or friendship. A declaration of that class, made so near the time of the homicide, might, with some show of logic and reason, be regarded as suspicious. A mere conclusion or an assertion of the defendant of his state of mind and affection towards his wife is not involved. What makes this declaration of peculiar value, and this is regarded by the law as important (Wigmore, section 1790) is that it indirectly and circumstantially indicates affection. If the defendant had merely asserted as a fact that he loved his wife, this declaration, made so near the homicide, might, as we have said, with some show of reason, be rejected as probably manufactured or self-serving. As to this, however, under the peculiar state of the record presented in this case, we do not deem it necessary to determine. Under the Early case and the other authorities we have cited it was admissible even when viewed from this standpoint. Wigmore, section 1730. But here is a declaration, apparently spontaneous in nature, not involving any bare assertion of affection, but indirectly and by clear inference indicating a friendly and affectionate state of mind towards his wife. It is true, as shown by Mr. Wigmore, in section 1730 of his work, that a declaration directly asserting as a fact the existence of a given emotion may be admitted. Many cases are collated by him under that section, illustrating the admissibility of such declarations. The case of State v. Leabo, 84 Mo., 168; State v. Pettit, supra, and Early v. State, all involve declarations directly asserting the existence of a given emotion. In most of these cases the declarations were held to be admissible upon the theory that they were in rebuttal of an opposite contention. It was admissible on that ground. But independently of this ground, and without reference to the doctrine laid down in the cases just referred to and discussed (Wigmore, section 1730), the conversation of defendant with Mrs. Drake was admissible under the rule discussed by that writer in section 1790 of his work. We will not quote from the section at length, but the following correctly states the rule:

" 'The condition of a speaker's mind as to knowledge, belief, rationality, emotion, or the like, may be evidenced by his utterances either used testimonially as assertions to be believed *or used circumstantially as affording indirect inferences.'*

"The conversation of Mrs. Drake was admissible as coming within the class last mentioned, viz: as a declaration to be 'used circumstantially as affording indirect inferences.' If defendant was unwilling for his wife to ride a dangerous horse because he was afraid she would be hurt, this indirectly indicates affection for her, and the declaration was admissible under this rule. Mr. Wigmore says, with reference to such evidence:

" 'It is worth while to emphasize the legitimacy of this circumstantial aspect of such evidence because it incurs the risk of being ignored

through the judicial disposition in part to account for it by the unmeaning shibboleth of res gestae (post section 1796) or by the exception for statements of a mental condition (ante section 1715). The evidence is *circumstantial,* not *testimonial,* and it is therefore not obnoxious to the hearsay rule *nor needs for its admission any exception to that rule.* No doubt in given instances it may be difficult to distinguish a genuine circumstantial use of utterances for this purpose, and this difficulty has generally been considered (ante section 285) ; but isolated instances of difficulty need not prevent us from recognizing the plain principle in its ordinary unquestioned uses.'

"Under the doctrine thus clearly stated, the conversation of the defendant with Mrs. Sarah Drake, expressing his unwillingness that his wife should ride the dangerous horse, said conversation occurring only two days before the homicide, was clearly admissible as furnishing to the jury a basis upon which it might have based an indirect inference that the contention of the State that defendant did not love his wife was unfounded. Moreover, there can be no doubt that this statement of the rule is correct. In fact, it is now generally conceded by the bar and bench that Mr. Wigmore, in his monumental work on Evidence, has produced one of the greatest, if not the very greatest, modern commentary on any legal subject. The entire work is characterized not only by the profoundest learning, but also by the most discriminative analysis. Of the many works on evidence, Mr. Wigmore's work stands unrivaled in its distinctive superiority. This being true, we are glad to cite the work in support of our position with reference to the admissibility of this testimony.

"In their opinion on rehearing, the majority of the court seem to concede the admissibility of this evidence and, if we interpret the opinion correctly, hold that the evidence should have been admitted. However, it is held that, notwithstanding this evidence was admissible and should have been admitted, the judgment should not be reversed on account of it being rejected. With this conclusion we are unable to agree. It is not for this court to determine the weight of the evidence. Revised C. C. P., art. 734. That responsibility rests with the jury. Same article. The evidence introduced against defendant is wholly circumstantial. No motive for the killing was ascribed to defendant, except a lack of affection for his wife and a desire to get rid of her. Much testimony along this line was introduced by the State. The conversation with Mrs. Drake happening just two days before the homicide involved and presented the latest expression by defendant of his attitude towards his wife. What weight the jury would have attached to this evidence we are unable to determine. We know, however, that the jury might well have concluded that, since defendant, just two days before the homicide, in a conversation with Mrs. Drake, expressed his unwillingness that his wife should ride this dangerous horse and a fear that if she did ride the horse she might be killed, he evidently loved his wife at that time. It is certain that no statement made either by him or by his wife at a time later than the conversation with Mrs. Drake, indicating a lack of

affection or bad feeling between them, was introduced. All of the declarations introduced by the State with reference to quarrels and disagreements related to times antedating the Drake conversation. If the jury had reasoned, as we have shown, with reference to the Drake conversation, it might have rejected the evidence of the State relating to disagreements and bad feeling previous to that time. Many arguments pro and con along this line might be offered. It is the wildest speculation to undertake to decide what view the jury might have taken of this evidence, had it been introduced before them. The evidence was admissible, was highly material and might have, in the opinion of the jury, changed the result. Therefore the judgment of conviction should be reversed.

"(4) We next desire to refer to defendant's bills of exceptions Nos. 12, 13, 14 and 25, all presenting in substance the same question. These bills complain of the exclusion by the trial court of the testimony of various witnesses to a conversation between defendant and deceased with reference to the swimming hole incident and with reference to the fact that defendant rescued his wife from drowning only a few days before the killing. This was sought to be proven by the testimony of the witnesses Berney Brown, E. I. Drinkard and his wife, and also by the testimony of the defendant, and was rejected. We will not state these bills of exception in detail. It is sufficient to say that, about a week before the homicide, the deceased and defendant went down to a certain creek not far from their residence, to go in bathing. There was water in the creek about ten feet deep. Defendant sought to show by the witness Berney Brown that that night at the supper table, after coming home, Mr. and Mrs. Brown related to the children this incident and the fact that defendant had saved her from drowning. Defendant further sought to show a conversation had between himself and Mr. and Mrs. Drinkard with reference to this drowning incident, and in which they related the incident to the Drinkards. We quote from the bill the testimony of the witness E. I. Drinkard that was offered and rejected:

"'Sister Brown spoke up and says, "Do you know I like to have got drowned the other day?" and my wife spoke and says, "No, I didn't hear anything about it." "Well," she says, "I did," and she asked them how it happened, and she said, "Me and Mr. Brown was going to town and we taken some clothes along with us and when we got to Wilis creek we stopped and went in bathing and I like to have got drowned," and Brother Brown he spoke up and says, "Yes, I stayed in with her as long as I wanted to and went out on the bank and when I got out I told her about the water and pointed the direction the deep water was and told her it was too deep out there," and he went out on the bank and he stayed there until he got a notion to change his clothes and he started to change his clothes and he heard her speak and say, "I'm drowning," and he said it didn't excite him at all, because she had been playing that way with him all the time in the water, and he looked around and sure enough she was drowning and he had to go in and get her out. And Sister Brown spoke and says, "You don't know how

thankful I was Mr. Brown was with me, if he had not been there me and the girls might have went down there and part of us or all of us might have got drowned." '

"We have quoted this to illustrate the general trend of this testimony. As stated, these conversations occurred only about a week before the homicide. We are of the opinion that, since the State had introduced many different transactions, conversations, declarations, quarrels, etc., indicative of a lack of affection asserted to exist between Mr. and Mrs. Brown, all being introduced to support the State's theory with reference to his motive to kill her, it was admissible for the defendant, in rebuttal, to introduce this testimony and that reversible error was committed in rejecting it. The testimony presents a dual aspect, and we submit that it was admissible upon two different theories. First, it was admissible in rebuttal, upon the grounds we have stated with reference to the testimony of the witness Minnie Thomas. Its admissibility upon this ground indirectly supported by the Leabo case, the Pettit case, and by the Early case, and the other authorities we referred to in discussing the testimony of the witness Minnie Thomas. Second, the testimony was admissible upon the principles just discussed with reference to the testimony of the witness Sarah Drake. In other words, aside from its admissibility, viewed testimonially, it was admissible as circumstantially and inferentially illustrating the state of mind existing between these parties at the time the conversations occurred. Upon this theory its admissibility would not be affected by the fact that, viewed as testimonial declarations, it should be rejected. In other words, the declarations of the deceased and defendant made to these witnesses, reciting or narrating the facts with reference to the swimming hole incident, might be rejected as hearsay, and still the conversation be admitted not to establish the facts as recited or narrated, but to establish the state of affections of the declarants. Upon both these grounds the testimony should have been admitted. The State had been given a very free hand in introducing evidence tending to show motive and its testimony had covered a wide scope. This testimony should have been admitted in rebuttal of the contention of the State that the defendant did not love his wife. The content of the conversation between defendant and his wife and between them and the witnesses referred to is wholly immaterial, viewed as testimonial assertions. It can make no difference what the parties might have been talking about. A conversation between them on any subject whatever at a time so recent before the homicide, indirectly indicating a friendly and affectionate state of mind, was admissible. When this testimony was offered, and when the counsel for the State had objected to the testimony on the ground that same was hearsay and upon the further ground that it was an error to reproduce the self-serving declarations of the defendant, counsel for defendant stated that the testimony was offered as original evidence as showing the feeling or mental attitude of the parties and was admissible just as declarations of health would be admissible. It is clear from the bills of exception that the testimony was offered not to prove the facts with

reference to the drowning incident but to prove the state of the mind of the declarants at the time of the conversation. Having been offered upon this theory, the objection of the State that it was hearsay and self-serving can not be sustained by any authority. No case has been cited or can be cited, holding that declarations tending to show mental condition, emotion of state of mind can be regarded as hearsay or as self-serving. If the declarations had been offered for their testimonial value as establishing the facts narrated or recited, then there might have been some point or force in the objections made by the State, but all the writers recognize that the objection that declarations indicating mental condition or emotion are hearsay or self-serving can not be sustained. This arises from the fact that such declarations are not classed as oral declarations. They are admissible as original evidence, circumstantially indicating a condition of mind and, when this consideration is held in mind, the objection that they are hearsay or self-serving appears at once to be wholly meaningless. If the rule were otherwise, it would be practically impossible, in a court of justice, to prove the mental state of any given person, for if his declarations, circumstantially indicative of that state, are not admissible, but are rejected as hearsay or self-serving, then evidently his acts, which also are merely circumstantially indicative of his state of mind, would be subject to the same objections and would not be admissible. In lieu of this the jury would have to accept the unsatisfactory, inconclusive and, in most instances, utterly unreliable statement of some witness as to what he then thought was the state of mind of the person in question at some previous time. Let us illustrate with reference to the case at bar. Let us suppose that defendant, while on the stand, should have testified directly that one week before the killing he felt very friendly towards the deceased, in fact loved the deceased and they were getting along well. What weight would the jury have given such an assertion? Evidently very little. But suppose that, instead of this unsatisfactory and apparently unreliable evidence, he should offer to prove, as he did, that a week prior to the killing he had made declarations himself to her and she had made declarations to him, and the two together had made declarations to third parties, indicating a friendly and affectionate state of mind. Would not the jury have given greater weight to this testimony, showing his state of mind at a time before his adverse interest had accrued? Again let us suppose that Mr. and Mrs. Drinkard had heard a conversation between defendant and deceased and, in this conversation, the parties had exhibited lack of affection for each other and the conversation had illustrated the fact that they were getting along badly. Evidently, the testimony would have been admitted by the court to support the theory of the State on the question of motive. In fact, just such testimony was admitted by the court from the mouths of other witnesses. If a conversation between defendant and his wife, indicative of lack of affection, was admissible, then and upon what theory either of logic or law, should a conversation between them, indicative of affection between them, be ejected? If it was proper for the State to use such evidence to estab-

lish the affirmative of the issue, why was it not equally proper for the defendant to use the same class of evidence to establish the negative of the issue? No sound reason can be suggested upon which this conversation should be condemned and rejected simply because it indicated a friendly instead of an unfriendly state of mind, for if it was relevant and admissible for the State to prove an unfriendly state of mind, it was equally relevant and material for defendant, in rebuttal, to establish a friendly state of mind. It is also true that, if the State could introduce the conversations of the parties in the presence of third parties to establish their unfriendly state of mind, then upon the same principle the defendant should have been permitted to introduce their conversations in the presence of third parties to establish a friendly state of mind. Such conversations are not admitted either on behalf of the State or of the defendant to establish the fact recited in the conversation, but are admitted as circumstantially indicating their state of mind. It is no valid objection, in this connection, to state that defendant himself was allowed to testify to the drowning incident. Defendant was not seeking by the witnesses Berney Brown and the two Drinkards to establish the facts with reference to the drowning incident. He was seeking, by this testimony, to establish a conversation between himself and his wife, in the presence of these parties, as indicating an affectionate state of mind at that time. The mere fact that they happened to be talking about the drowning incident was of no consequence. If they had been talking about politics or religion or any other subject, and if the conversation, viewed as a circumstance, tended to establish or illustrate a friendly state of mind between the parties, it would have been admissible, not for its testimonial value, as establishing the facts they were talking about, but merely as a circumstance to show the state of mind. Therefore, we say that the testimony of the defendant with reference to the facts relating to the drowning incident furnish no substitute whatever for this testimony. To so hold indicates confusion with reference to the grounds upon which such declarations are admitted. If we hold in mind the fundamental consideration that the declarations were offered and were admissible, not for their testimonial value as establishing the facts of the drowning incident, but for their value in illustrating a state of feeling, then we can see at once that the testimony of the defendant with reference to such facts furnish no substitute whatever for this testimony. Clearly, the trial court committed error in rejecting this testimony. A ruling to the contrary, we submit, is opposed not only to all legal precedent, but is opposed to sound reason and scientific fact. When, in a court of justice, it becomes material to investigate the state of affection of one person toward another, or to investigate their mutual state of affection, and their declarations indicative of this state are rejected, then the court not only overrules legal precedent, but also scientific fact and sound reason.

"And in this connection, and in considering this error of the court, it should be considered in connection with the rejection of the testimony of Mrs. Drake. If the testimony of Berney Brown and the two

Drinkards just discussed had been admitted, and the testimony of Mrs. Drake had been admitted, that would have thus placed before the jury evidence strongly tending to show that just prior to the homicide, an affectionate state existed between these two parties. This would have tended strongly to rebut and destroy the contention of the State on the issue of motive. All the previous quarrels and disagreements and bad feeling introduced by the State related to a time antedating these conversations. We do not deem it necessary to speculate with reference to the effect of this testimony upon the jury in making up their verdict, but, even from that standpoint, it appears that the rejection of the testimony was highly prejudicial. It is unnecessary to again discuss the authorities. Those that we have referred to in discussing the testimony of Minnie Thomas are in point. Those that we have referred to in discussing the testimony of Mrs. Drake are even more in point. It is clear that the decision in this case overruled, without notice or comment, that of this court in the case of Early v. State, 51 Texas Crim. Rep., 382, at page 392. It is also contrary to the other decisions we have cited. See Morrison v. State, 40 Texas Crim. Rep., 473, at page 497; the two reports of the Cole case, heretofore referred to; Nelson v. State, 58 S. W. Rep., 107; Wigmore on Evidence, sec. 1730, also secs. 1732 and 1790; Wharton on Evidence, sec. 693, sec. 904, p. 1696, and sec. 948, p. 1828. See also the Pettit and Leabo cases we have heretofore discussed; Greenleaf on Evidence, sec. 102; Commonwealth v. Trefethen, 157 Mass., 180. We quote the following from Mr. Wigmore's work, section 1732:

" 'To hold that every expression of hatred, malice and bravado is to be received, while no expression of fear, good will, friendship, or the like, can be considered, is to exhibit ourselves the victim of a whimsicality which might be expected from the tribunal of a Jeffreys, going down from London to Taunton, with his list of victims in his pocket or of a bench condemning to order, as Zola said of Dreyfuss' military judges.'

"The appellant, in his twenty-fifth, twenty-sixth and twenty-seventh assignments of error, as presented in his brief and in his motion for rehearing, complains of the alleged error of the trial court in failing to submit directly and affirmatively to the jury the question as to whether or not a third party committed the offense charged against the defendant. We respectfully submit that these assignments should be sustained, and we will discuss the matter briefly.

"We understand that the court, in its opinion, recognizes the general rule that, where there is in the record any evidence tending to support an affirmative defense in favor of the defendant, he is entitled to a direct and affirmative presentation of such defense to the jury. It is useless to refer to the many authorities so holding. To do so would be mere pedantry and a useless consumption of time and space. The rule is based upon the conceded fact that, unless such defenses are presented directly and affirmatively from the defendant's standpoint to the jury, the jury would be disposed, at least in some instances, to underestimate such defenses. If the trial court fails in his charge to submit defensive

matter affirmatively to the jury, the jury may properly conclude that the trial judge attaches very little, if any, importance to such defense. This being true, no rule of practice is better settled both in civil and criminal cases that each litigant is entitled to have his theory of the case submitted in direct form to the jury. Now, in the case at bar, the defendant testified directly that this murder was committed by a third party. It is unnecessary to refer to his testimony on this subject in detail. It is set out in the court's opinion. His statement, made immediately after the homicide, was also introduced, and in this statement he charged a third person with the murder. The trial judge did not submit to the jury in direct and affirmative form the defense of the defendant thus raised that the offense was committed not by himself but by a third party. The trial judge, however, did charge the jury, as stated in the court's opinion, that, since the State had introduced the statements of the defendant, the burden of proof rested upon the State to prove beyond a reasonable doubt the falsity of said statement. The court holds, in its opinion, that this charge was a sufficient presentation of the defendant's defense that the crime was committed by a third party. We submit that, in this conclusion, there is clear error. To justify its holding, the court says, in its opinion: 'What testimony is there that raises this issue? The statements of the defendant on the night of the homicide and his testimony on the trial. There is no other witness who testified to any fact which would raise that issue.' Again, we quote: 'If the defendant's testimony on the trial had been different or had presented any new defense other than the explanation or statement given by him on the trial, or had there been any other testimony adduced on the trial other than the testimony of the defendant himself raising the issue that some other person committed the crime, there might be merit in this last contention of the appellant.' These quotations from the court's opinion, as well as the authorities referred to by the court, show that the court concluded (1) that there was no evidence in the record tending to show that this murder was committed by a third party, except the statement of the defendant, introduced by the State, and except his testimony on the trial; and (2) that, since the court, in his main charge, told the jury that after having introduced defendant's statement, the burden of proof rested upon the State to establish its falsity beyond a reasonable doubt, and, therefore, that it was not necessary to present any further charge on the subject, there being in the record, according to the court's opinion, no evidence other than the statement and testimony of the defendant tending to support the defense.

"The difficulty with the opinion of the court on this point is that it is based upon an incorrect premise. If there were no testimony in the record other than the statement of the defendant introduced by the State and his testimony on the trial, it is doubtful that the charge given by the court to the effect that the State must disprove the statement, would be a sufficient presentation of this defense. However, there is evidence in the record other than the statement and testimony of the

defendant, tending to support his theory of this matter, and we will, therefore, discuss the point briefly.

"The State contended that defendant committed the crime. Its case was made out wholly by circumstantial evidence. It relied in the main upon a showing of motive, opportunity, the supposed absence from the scene of the crime of anyone else who might have committed it, the fabrication of evidence, the alleged effort of defendant to impose on those who came in response to his call, and his story of the crime, which the State contended was improbable, if not impossible, in itself. The defendant admitted his presence at the scene of the homicide at the time the same was committed. We have, therefore, the State relying (1) upon the actual presence of the defendant; (2) upon the weight of other circumstances tending to show his guilt. Now, on this defensive issue, the defendant testified that the crime was committed by a third person. He testified in detail as to how it was committed. Hard Daniels, deputy sheriff, and Mr. Denman testified that they looked around the house and yard for tracks, and that some forty or fifty steps from the house they found a pair of pants which some of the other witnesses identified as belonging to defendant. They also found tracks going to and from the house. They also found a knife belonging to defendant lying on the ground just a short distance from the pants. They followed the tracks for some forty or fifty steps further beyond the knife and then lost the trail. The witness Daniels further testified that, in an east direction from the house they found some other tracks going toward the house. Who made these tracks was not shown, except by the opinion of the witnesses. The State contended they were made by defendant. The defendant contended they were made by the third party who committed the crime. This court can not say, as a matter of law, which of these two contentions is correct. The mere fact that the tracks may have looked like those of the defendant would not authorize the court to conclude as a matter of law that they were made by the defendant. If the testimony of defendant that the third party committed the crime be correct, then these tracks may have been made by the third party. At any rate, this testimony was just as consistent with defendant's innocence as with his guilt. In fact, the jury might well have concluded that all the physical facts and circumstances introduced by the State were as consistent with defendant's guilt as with his innocence. The jury might have believed that the tracks were made by the third party; in fact, they might more naturally have believed that they were made by the third party than to believe the somewhat improbable theory of the State that defendant, after committing this crime, in order to cover his guilt, went out and made these tracks to and from the house himself. The evidence rather strongly indicates that appellant did not make the tracks after the homicide, if he made them at all. All of this testimony tended to support the theory of the defendant and the court is in error in stating in the opinion that there was no testimony tending to show that the presence of a third party at the scene of the homicide other than the testimony of the defendant. For the court to

so hold amounts to finding as a matter of law that the tracks were made by defendant, and this can not be done. It is clear to us that the court has committed error in this matter.

"We will not refer to the authorities at length. However, Bond v. State, 23 Texas Crim. App., 180, is directly in point. In that case, the defendant made a statement, when he was found in possession of certain oats alleged to have been stolen, that he had purchased them. He testified to the same defense on the trial. The court gave the usual charge with regard to the explanation made by the defendant, but did not affirmatively present to the jury as a defense the question as to whether or not he purchased the oats. It was held that this failure was reversible error. The doctrine was reaffirmed in Shuler v. State, 23 Texas Crim. App., 182; see also White v. State, 18 Texas Crim. App., 57-63; Irvine v. State, 20 Texas Crim. App., 12; Wheeler v. State, 34 Texas Crim. Rep., 350; Kirby v. State, 49 Texas Crim. Rep., 517; Wheeler v. State, 56 Texas Crim. Rep., 547. The case referred to in the court's opinion supports our theory, for it recognizes that, where there is testimony in the record other than the statement of the defendant, the charge on explanations will not be regarded as a sufficient, affirmative presentation of the defense. There being, as we have shown, in this record other testimony tending to support the theory of the defendant that a third person was present and committed this crime, it is clear that this defense should have been affirmatively and not merely indirectly or inferentially presented and, in failing to do so, the trial court committed reversible error.

"There is another error to which we desire to briefly call the court's attention. The court instructed the jury that the testimony of Mrs. Beeman, concerning the statements made by Lloyd Brown to her, to the effect that the deceased spoke or talked after receiving her injuries could be received only in support of the credibility of the said Lloyd Brown's testimony and could not be considered as any evidence that the deceased, Sallie Brown, did in fact speak or talk after the injuries were inflicted upon her. This charge was clearly erroneous. The court, in its opinion, in effect concedes that the charge is erroneous, but determines that, notwithstanding the error in the charge, it must be held that the appellant was in no condition to complain of same. This latter theory is based upon the fact that the court gave, at appellant's request, a charge to the effect that the testimony of the witnesses Early, McGaugh and Beeman, concerning the statements of the witness Lloyd Brown, to the effect that the deceased made no statement after she was injured, could be considered only for impeachment purposes and could not be considered as any evidence that said deceased did not in fact speak and talk after the injuries were inflicted upon her. The court invoked the rule laid down in the case of Cornwell v. State, 61 Texas Crim. Rep., 122, and holds that, in requesting this charge, the appellant invited the error committed in the main charge. Now, we recognize that the rule of invited error is well settled and that it applies in criminal as in civil cases. We also believe that this rule, when applied, is a wise and salu-

tary rule of procedure. We do not believe that any litigant should be allowed to trifle with the trial judge and, after having induced the trial judge to submit the case to the jury on one theory of law, present to the appellate court a contention for reversal, based upon another and entirely different theory of law. We submit, however, that, without exception, where the rule of invited error has been held to apply, it has been held that the requested instruction must relate to the precise question and issue to which the charge complained of relates. For instance, a requested charge on the issue of provoking a difficulty does not invite the trial court to give an erroneous charge on the issue of mutual combat. An erroneous charge requested by defendant on manslaughter does not invite the court to present an erroneous charge on murder. In every case, the requested charge and the charge complained of must relate to the same question. Now, tested by this rule, it is evident that the court is wrong. The charge relating to statements made by Lloyd Brown that his mother did not speak after her injuries was demanded and must have been given even if Mrs. Beeman had never lived or never testified. Lloyd Brown testified on the trial that his mother did speak after she was injured. Therefore, the testimony of these witnesses to the effect that he told them she did not speak was properly receivable by way of impeachment. That testimony is clearly separable from the evidence that was given by Mrs. Beeman. It is also clear that the charge in respect to such impeaching evidence was required to be given and that if it had not been given in substance, the case would have probably been reversed even in the absence of such request. See Henderson v. State, 58 Texas Crim. Rep., 581; Bennett v. State, 43 Texas Crim. Rep., 241.. If there can be said to be any error in the requested charge on this subject given by the court at the suggestion of counsel, then there can be no answer to or complaints of the charge in respect to the testimony of Mrs. Beeman above set out, for the reason that the two charges considered by the court were with reference to wholly unrelated subjects. Suppose the requested charge does go too far in respect to impeaching testimony? On what theory or rule of law did this justify the trial judge in giving an erroneous charge on supporting testimony? The Cornwell case does not support the court's opinion on this point. Again, there is another reason establishing the error in this charge. Under the peculiar circumstances of this case, the statements of Lloyd Brown testified to by Mrs. Beeman was original testimony, admissible as res gestae declarations. That testimony offered as supporting testimony may often be received as coming within the rule of res gestae is elementary. See Wharton's Criminal Evidence, volume 1, page 1024. While the testimony of Mrs. Beeman with reference to the statements of Lloyd Brown were admitted as supporting testimony, still such statements were admissible as res gestae. The statement was made the night of the tragedy within a short time after it occurred and within a very short time after the young lad, Lloyd Brown, became acquainted with the injury to his mother. The statement was made under circumstances that rebut any suggestion that it

was inspired by appellant. Everything in ·the record tends to show that the declaration was an instinctive expression of unpremeditated truth, voicing itself through the innocent boy. There is no arbitrary limit of time within which res gestae declarations are confined. 'They vary with each particular case. They need not be coincident as to time if they are joined by the existing feeling which exists without break or let down from the moment of the event they elicit.' McGee v. State, 31 Texas Crim. Rep., 71; Bronson v. State, 59 Texas Crim. Rep., 17, 127 S. W. Rep., 175. In this case the court says: 'She (Mrs. Beeman) was called to the home in about half an hour or such matter after the injury had been inflicted and that Lloyd Brown told her about his mother making the statement to him that he had testified to on this trial.' Statements made by deceased an hour and a half after being injured have been received. Lewis v. State, 29 Texas Crim. App., 201, and the books are full of cases where the mere question of time has been· considered as an unimportant circumstance. It seems to us that, in this case, considering the short time, the necessary and inevitable excitement of the boy, his extreme youth, the lack of any motive on his part to fabricate a story, and the lack of ingenuity to conjure up a statement of this kind, that, both on reason and authority his declaration was admissible as res gestae. This being true, the charge of the trial court that it could be considered only as supporting his credibility was clearly erroneous. That the error was harmful there can be no doubt. Among the things which the State sought most strongly to prove was the utter impossibility of Mrs. Brown speaking after her injuries. This was a contested issue in the case. Another issue vitally important was whether Mrs. Brown sat up. The State's evidence was, in substance, that, with her injuries, it would have been impossible for her either to have sat up or to have spoken. Brown said that she did both. Lloyd said, in a very short time after the injuries, that she did speak. If the jury had believed Lloyd's declaration, then it·would be a strong inducement to them to credit Brown's statement and find against any·charge suggesting a theory of fabrication. We would respectfully submit that, on account of this error, the judgment should be reversed."